957 P.2d 1076

Harvey KUTCHER, Plaintiff–Appellant,

v.

Rebecca ZIMMERMAN, an individual, and Millie Peluso, an individual, Defendants–Appellees.

No. 19780.

Intermediate Court of Appeals of Hawai'i.

May 4, 1998.

As Amended May 15, 1998.

Burton D. Gould, on the brief, Paia, for plaintiff-appellant.

Gary N. Hagerman, on the brief, Hilo, for defendants-appellees.

Before BURNS, C.J., and ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

We hold that a plaintiff alleging the tort of intentional interference with prospective contractual relations must plead and prove (1) a prospective contractual relationship existed between the plaintiff and a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally interfered with the relationship; (4) the defendant acted without proper justification; (5) the defendant's interference caused the third party to fail to consummate the prospective contract with the plaintiff; and (6) the defendant's interference caused damages to the plaintiff.

In granting summary judgment in favor of Defendants–Appellees Rebecca Zimmerman (Zimmerman) and Millie Peluso (Peluso) (collectively referred to herein as Defendants) and against Plaintiff–Appellant Harvey Kutcher (Kutcher) on Kutcher's claim of intentional interference with prospective contractual relations, the second circuit court (the court) apparently relied on the test for this tort set forth in the *Restatement (Second) of Torts* § 766B (1977) (section 766B). Because section 766B has been criticized as unworkable, we decline to adopt it. However, applying the elements above and for the reasons set forth herein, we reach the same conclusion as the court.

We affirm, therefore, the court's March 27, 1996 order granting summary judgment in favor of Defendants and the corresponding April 11, 1996 judgment.

I.

A.

We consider the following agreed-upon facts as presented in the parties' summary judgment memoranda and the exhibits attached thereto, although, preliminarily, we observe that none of the exhibits relied upon were supported by any appropriate affidavit or certification under Hawai'i Rules of Civil Procedure (HRCP) Rule 56(e). *See* discussion *supra* part III.

Kutcher was apparently working for a temporary employment agency and was assigned to Avis Rent–A–Car (Avis) on the island of Maui when he came under consideration for full-time employment with Avis.

A drug screening test was a mandatory requirement for every prospective Avis employee. Accordingly, on June 22, 1995, Kutcher went to the Clinical Laboratories of Hawaii (CLH), Kahului location (the Kahului lab), to take a drug test.

After Kutcher arrived at Kahului lab, Zimmerman, a CLH employee, completed the necessary paperwork, gave Kutcher a specimen jar, and showed him to a bathroom where he was to give a urine sample. Kutcher entered the bathroom, and according to Zimmerman, remained there for about ten to fifteen minutes.

Zimmerman then knocked on the bathroom door and asked Kutcher if he was "all right." Kutcher came out of the bathroom and gave Zimmerman the specimen jar, which contained about 40 cubic centimeters (c.c.s) of urine. Zimmerman informed Kutcher that the specimen was insufficient and would have to be discarded because the laboratory required 60 c.c.s of urine.

In his summary judgment memorandum and again on appeal, Kutcher acknowledged that he became "very upset" and accused Zimmerman in a loud voice of treating him unfairly. In her deposition, Zimmerman characterized Kutcher's behavior as "extremely rude." Zimmerman explained, "The rudeness wasn't, I don't think, directed at me. I didn't take it personally. It bothered me more that he was doing this around patients." She also stated that "[she] wasn't angry, but [she] was upset because he was accusing [her] of being unfair and that was not the case at all." Kutcher then "grabbed" his paperwork and indicated that he was going to Millyard, the CLH lab in Wailuku (the Wailuku lab), to have the test performed.

After Kutcher left, Zimmerman called the Wailuku lab and spoke with her co-worker Peluso, a CLH employee at that lab, to inform her that Kutcher was on his way there.

Zimmerman also informed Peluso about Kutcher's behavior at the Kahului lab.

Kutcher did not immediately report to the Wailuku lab. Approximately thirty to forty-five minutes after speaking with Zimmerman, Peluso made a telephone call to Avis and spoke with Debbie Tauchas (Tauchas), Avis's District Manager. Peluso claimed that it was standard procedure for CLH to call an employer if a drug screening test was not completed as arranged by the employer. However, Peluso was not usually the CLH employee to make this call and apparently did so because her supervisor was not at the Wailuku lab at that time.

Peluso testified in her deposition that the purpose of her call was to inform Tauchas that Kutcher had not completed the drug test at the Kahului lab and that he indicated he was going to the Wailuku lab to have the test performed, but had not yet arrived. Peluso also informed Tauchas that Kutcher "had become upset with" and "yell[ed]" at Zimmerman.

In recounting her conversation with Tauchas from that point, Peluso stated,

> [Tauchas] said … something about that, "Imagine how he would treat our employees"—or "customers. I'm sorry if he treated your employees that way." And I was shocked. And I told her that the reason—I reiterated the reason for my phone call was to let her know that we hadn't received a specimen, an acceptable specimen.

Kutcher did report to the Wailuku lab later that same day.

Tauchas explained in her deposition that she was concerned by her conversation with Peluso because "if there was a confrontation at the lab … that could turn into a confrontation with an employee or with a customer." Hence, Tauchas reviewed Kutcher's employment application and reported that the application was not complete and that "there were some inconsistencies with previous employers." Tauchas also indicated that the Kahului lab, and not the Wailuku lab, was the designated collection site for Avis.[1] She then

---

1. Debbie Tauchas (Tauchas) testified that the

Clinical Laboratories of Hawaii (CLH), Kahului

determined that Avis "didn't have enough information" to offer Kutcher employment "at that time."

Tauchas stated that she is the person "ultimately ... responsible" for hiring employees at Avis, that she had no prior contact with any CLH employee about other patients, and that no one from CLH indicated whether or not it would be "a good idea" for Avis to hire Kutcher.

According to Julie Rodrigues (Rodrigues), another Avis employee, Kutcher told her the day after the incident that he had been "treated unfairly" at the lab. Rodrigues advised Kutcher that "he needed to talk to [Tauchas]." However, Tauchas indicated that Kutcher never contacted her, nor did she contact him to inquire about what occurred at the Kahului lab.

### B.

On October 6, 1995, Kutcher filed a complaint against Defendants in their individual capacities for their alleged "tortious and improper interference" with Kutcher's "business relationship" with Avis, which caused Kutcher to "suffer[ ] a loss of the economic expectancy arising from the relationship." Kutcher claimed that on or about June 22, 1995, Avis was "contemplat[ing] employing [him] full time" and he "was required to go for a drug test in order to work for [Avis]." In the course of his taking the drug test at CLH, Kutcher asserted, Zimmerman "engaged in an argument with [Kutcher] because of [his] inability to produce 60 [c.c.s] of urine." According to Kutcher, Zimmerman then informed Peluso that Kutcher "did not comply with [Zimmerman's] request[,]" leading Peluso to call Avis and "inform[ ] them that [Kutcher] had not cooperated and was an argumentative person."

Kutcher maintained that Zimmerman's and Peluso's actions "were done with the intent to disrupt [his] relationship with [Avis] and ... did in fact disrupt that relationship." As to Defendants' motives, Kutcher alleged that "Defendants engaged in the interfering conduct with malice towards [Kutcher] and a desire to injure [him] economically and with wantonness and disregard of [his] rights." Kutcher further alleged that "Defendants' conduct was improper, unlawful and unfair." Finally, he claimed that Defendants' actions were not "justified or privileged[.]"

On October 27, 1995, Defendants filed their answer to Kutcher's complaint, alleging "truth" as one of their defenses.

On March 6, 1996, Defendants filed their motion for summary judgment, contending that Kutcher could not establish any of the essential elements required for the tort of intentional interference with a prospective contractual relationship. Specifically, Defendants argued that they did not know of Kutcher's potential employment with Avis, that they did not intentionally interfere with Kutcher's prospects for obtaining employment with Avis, that they did not act in pursuit of an improper purpose, and that their acts were not the cause of Avis's decision to deny Kutcher employment.

On March 15, 1996, Kutcher filed a memorandum in opposition to Defendants' motion. Relying on the elements of the tort of intentional interference with prospective contractual relations as set forth in section 766B,[2] Kutcher argued that Defendants intended to interfere with his prospective employment with Avis, that the interference was improper under the factors enumerated in the *Restatement (Second) of Torts* § 767 (1977) (section 767), and that the interference was "the legal cause of the pecuniary harm suffered by [Kutcher] as a result of not obtaining the prospective contract" with Avis.

location (the Kahului lab), was the designated collection site for the mainland laboratory where CLH's specimens for Avis Rent–A–Car (Avis) were sent. According to Tauchas, Avis had agreed to use the Kahului lab as the collection site for the mainland laboratory.

**2.** In his opposition memorandum, Plaintiff–Appellant Harvey Kutcher (Kutcher) did not specify the year of the *Restatement (Second) of Torts* from

which he quoted, but he quotes from the *Restatement (Second) of Torts* (1965) in his amended opening brief. We note that the sections of the *Restatement (Second) of Torts* quoted by Kutcher in his memorandum and on appeal are the same as the ones appearing in the *Restatement (Second) of Torts* (1977) and we thus refer to the 1977 version in our opinion.

Although stating that "Defendants' [sic] intended to interfere[,]" Kutcher has focused all of his arguments, before the court and again on appeal, on Peluso only, asserting that Peluso had the requisite intent to interfere and that Peluso's interference was improper. Kutcher observed that "interference can be improper even though innocent means are employed[,]" and argued that there were genuine issues of material fact concerning "whether Peluso's motive in making the call [to Avis] was to seek vindication and retribution for the perceived ill treatment of her co[-]worker." Kutcher characterized Peluso's asserted purpose of calling Avis pursuant to standard procedure as "a pretext for advancing her socially undesirable interests."

At the hearing on Defendants' motion, the court determined there was no evidence demonstrating that Zimmerman had any intent to interfere with Kutcher's prospective employment. The court also stated that "the only [remaining] question [was] whether or not [Peluso] was carrying out [CLH's] company policy [when she contacted Avis about Kutcher] or whether she [did it as] a vindictive act, and [was] therefore seeking to interfere with [Kutcher's] prospective employment with Avis." As to this question, the court concluded that there was no genuine issue as to a material fact and apparently found that Peluso called Avis pursuant to CLH's company policy. Accordingly, the court granted Defendants' motion.

On March 27, 1996, the court entered a written order granting Defendants' summary judgment motion.

3. On June 26, 1996, Defendants–Appellees Rebecca Zimmerman (Zimmerman) and Millie Peluso (Peluso) (collectively referred to herein as Defendants) filed a motion to dismiss Kutcher's appeal for want of appellate jurisdiction, on the grounds that Kutcher did not file a notice of appeal within 30 days after entry of the final judgment, and that he did not appeal from the order entered in the proper case. On July 9, 1996, the Hawai'i Supreme Court filed an order denying Defendants' motion.

4. Before the second circuit court (the court) and on appeal, Kutcher focused his arguments on Peluso, stating that "[t]he issue is whether Peluso used CLH's company policy as pretext to call Avis and seek vindication and retribution for the perceived mistreatment of her co-worker by in-

On April 4, 1996, Kutcher filed a notice of appeal from the written order.

The court entered a final judgment in favor of Defendants and against Kutcher on April 11, 1996.[3]

## II.

On appeal, an order of summary judgment is reviewed under the same standard applied by the trial court. *State v. Tradewinds Elec. Serv. and Contracting,* 80 Hawai'i 218, 222, 908 P.2d 1204, 1208 (1995). Consequently, we must determine whether, viewing all the evidence in a light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and the moving party [has] clearly demonstrate[d] that it is entitled to judgment as a matter of law." *Id.;* HRCP Rule 56(c).

Although Kutcher seeks reversal of the court's order granting Defendants' summary judgment motion, he has presented no argument, in opposition to the motion or on appeal, that Zimmerman intentionally interfered with Kutcher's prospective employment with Avis.[4] We thus affirm the award of summary judgment as to Zimmerman. *See Loui v. Bd. of Medical Examiners,* 78 Hawai'i 21, 29 n. 19, 889 P.2d 705, 713 n. 19 (1995).

Hence, we address the award of summary judgment with respect to Peluso only.

## III.

As noted previously, the exhibits[5] relied upon in the parties' summary judgment

terfering with Kutcher's prospective employment." Kutcher maintains that Peluso intended to interfere with Kutcher's prospective employment, that her interference was improper, and that her interference was the legal cause of his pecuniary harm. No such arguments have been made with respect to Zimmerman.

5. Defendants attached the following unsworn and uncertified exhibits to the memorandum in support of their summary judgment motion: a portion of Zimmerman's deposition (Exhibit A); a portion of Peluso's deposition (Exhibit B); a portion of Tauchas's deposition (Exhibit C); and a portion of the deposition of Julie Rodrigues (Rodrigues) (Exhibit D).

Kutcher attached the following unsworn and uncertified exhibits to his opposition memoran-

memoranda were not supported by an appropriate affidavit or certification under HRCP Rule 56(e).[6] *See Fuller v. Pacific Medical Collections,* 78 Hawai'i 213, 224, 891 P.2d 300, 311 (App.1995) (refusing to consider unauthenticated and unsworn documents); *Wolfer v. Mutual Life Ins. Co.,* 3 Haw.App. 65, 68, 641 P.2d 1349, 1352 (1982) (noting that unsworn or uncertified documents cannot be considered on a motion for summary judgment); *DeMund v. Lum,* 1 Haw.App. 443, 445, 620 P.2d 270, 272 (1980) (holding that the provision of HRCP Rule 56 requiring that documents must be either certified or sworn to is mandatory); *Munds v. First Ins. Co. of Hawaii,* 1 Haw.App. 104, 105–06, 614 P.2d 408, 409–10 (1980) (concluding that an HRCP Rule 56(e) violation could be sufficient to require a reversal of the award of summary judgment).

■ Although uncertified, we consider all the deposition excerpts[7] and other exhibits submitted by the parties because they were not objected to by any party and were referred to by both parties in their court memoranda and on appeal. *Tradewind Ins. Co. v. Stout,* 85 Hawai'i 177, 181, 938 P.2d 1196, 1200 (App.1997), *cert. denied,* 85 Hawai'i 81, 937 P.2d 922 (1997).

The facts presented in part I.A., *supra,* are the facts set forth in the summary judgment memoranda and exhibits, about which the parties are in apparent agreement.

## IV.

Kutcher based his arguments opposing the motion and before this court on the definition of the tort of intentional interference with prospective contractual relations set forth in section 766B. However, our jurisdiction has not adopted the section 766B approach, or any approach, to defining this tort.[8] Therefore, we examine several alternative approaches followed by other states and set forth the elements of the tort to be applied in this case before addressing Kutcher's arguments concerning whether the court erred in granting summary judgment to Peluso.

## A.

Initially, we observe that liability for interference with prospective contractual or economic relations was imposed as early as the fifteenth century, "but it seems to have been limited rather definitely to the use of ... improper means [such as actual or threatened physical violence]." W.P. Keeton, .D. Dobbs, R. Keeton, & D. Owen, *Prosser and*

---

dum: a handwritten document labeled CLH "Laboratory Report" signed by Zimmerman (Exhibit A); a handwritten document labeled CLH "Incident Report" signed by Peluso (Exhibit B); a portion of Zimmerman's deposition (Exhibit C); a portion of Peluso's deposition (Exhibit D); a portion of Tauchas's deposition (Exhibit E); and a portion of Rodrigues's deposition (Exhibit F).

6. Hawai'i Rules of Civil Procedure Rule 56(e) states, in pertinent part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his [or her] pleading, but his [or her] response ... must set forth specific facts showing that there is a genuine issue for trial.

7. We note that although Kutcher's counsel designated "all of the records and files, including depositions" in the case to be included in the record on appeal, apparently no depositions were ever filed in the record on appeal.

8. The tort of interference with prospective economic advantage, or prospective contractual relations, apparently has been recognized by Hawai'i courts, but no elements of this tort have been articulated. *See Gerner v. Estate of James Campbell,* 72 Haw. 4, 5, 803 P.2d 199, 200 (1990) (affirming, without discussion, judgment on count alleging interference with prospective economic advantage), *reconsideration denied,* 72 Haw. 616, 841 P.2d 1074 (1991); *Pelosi v. Wailea Ranch Estates,* 10 Haw.App. 424, 434–35, 876 P.2d 1320, 1326 (listing count alleging interference with the defendants' existing contracts and prospective economic advantage; the judgment on that count was not appealed), *reconsideration denied,* 10 Haw.App. 631, 879 P.2d 591, *cert. denied,* 77 Hawai'i 373, 884 P.2d 1149 (1994); *Marshall v. University of Hawai'i,* 9 Haw.App. 21, 28, 39, 821 P.2d 937, 942, 947 (1991) (affirming summary judgment on count alleging interference with prospective contractual relations because the plaintiff did not suffer injury).

*Keeton on the Law of Torts* § 130, at 1005 (5th ed.1984) [hereinafter *Prosser and Keeton on the Law of Torts*] (footnote omitted). At that time, "liability was imposed for business expectancies and was not limited to interference with existing contracts; but in all [reported cases] the actor's conduct was characterized by violence, fraud or defamation, and was tortious in character." Section 766B comment b at 21.

This basic principle changed with the 1853 decision of *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng.Rep. 749. *See* Section 766B comment b at 22. *Lumley* appears to be the first decision where liability was imposed "when the means of inducement were not tortious in themselves, and it was the intentional interference with the relation that was the basis of liability." *Id.* In *Lumley*, the defendant was held liable for intentionally inducing an opera singer to breach her existing contract with a theater, and "[t]he doctrine [was] thus announced[ ] that intentional interference with a contract may be an actionable tort[.]" *See Prosser and Keeton on the Law of Torts* § 129, at 980. Because the means were not tortious, "[c]onsiderable stress was laid upon the 'malice' with which it was alleged that the defendant was animated." *Id.* Forty years later, in *Temperton v. Russell*, [1893] 1 Q.B. 715, the principles of liability for interference with existing contractual relations were extended to actions for "interference with business relations that are merely prospective and potential." Section 766B comment b at 22; *see also Prosser and Keeton on the Law of Torts* § 130, at 1005.

### B.

Acknowledging the tort's origins in English law, it has been said in the United States that liability for the tort attaches if the intentional interference is accomplished "by tortious, illegal, or unconstitutional acts." *Prosser and Keeton on the Law of Torts* § 129, at 982 (footnotes omitted). Further, liability for interference with existing or prospective contractual relations may be imposed if a defendant "acts for an improper purpose." *Id.* (footnote omitted). "Intentional interference of course [also] presupposes knowledge of the plaintiff's contract or interest, or at least of facts which would lead a reasonable person to believe that such interest exists." *Id.* (footnote omitted).

Much of the case law has grappled with the unsettled question of what constitutes an "improper purpose" or similarly worded element. That question has proven much more difficult to delineate than the improper means by which an interfering party will be held liable:

> Although this "improper" interference was once described as "malicious," it is now clear that no actual spite has been required at all, and the term has gradually dropped from the cases, *leaving a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that purposes must be considered improper in some undefined way.*

*Id.* at 979 (emphasis added) (footnotes omitted). Indeed, even with several attempts to define the term "improper purpose" by various authorities, *see supra*, it is still an

> unresolved question, whenever the defendant has not simplified the matter by using illegal or tortious means of interference, as to what purpose or state of mind will be found *improper or unjustified* so as to furnish a basis for liability. On this central issue there is no firm answer, and no doubt a good deal of balancing of interests must take place in rendering any decision.

*Id.* at 984 (emphasis added) (footnote omitted).

The reference to an "improper *or* unjustified" purpose presents another problem in applying this tort. The requirement that the interference "be not justifiable has been treated by some courts as imposing the responsibility on the plaintiff to allege and prove that the conduct was not justifiable, while other courts have treated justification in accordance with its usual meaning as an affirmative defense." *Restatement (Second) of Torts* Introductory Note to Chapter 37 at 6 (1977). Thus, unlike other intentional torts, with the torts of intentional interference with existing and prospective contractual relations, "there is no clearcut distinction

between the requirements for a prima facie case and the requirements for a recognized privilege." *Id.* at 5.

With this in mind, we examine three alternative formulations that have been developed for the tort of intentional interference with prospective contractual relations.

## V.

The approach adopted in the first *Restatement of Torts* § 766 (1939) (section 766) treated intentional interference with prospective contractual relations as a prima facie tort subject to proof of a "privilege" as an affirmative defense. *See, e.g., Owen v. Williams,* 322 Mass. 356, 77 N.E.2d 318, 319–21 (1948); *Mitchell v. Aldrich,* 122 Vt. 19, 163 A.2d 833, 836–37 (1960); *Calbom v. Knudtzon,* 65 Wash.2d 157, 396 P.2d 148, 151–52 (1964); *see also Prosser and Keeton on the Law of Torts* § 129, at 983. Section 766 provided:

> Except as stated in [*Restatement of Torts* § ] 698,[9] one who, *without a privilege* to do so, induces or otherwise *purposely* causes a third person not to
>
> > (a) perform a contract with another, or
> >
> > (b) enter into or continue a business relation with another
>
> is liable to the other for the harm caused thereby.

(Emphases added.)

Under this approach, the plaintiff must prove only "that the defendant intentionally interfered with his [or her] prospective contractual relations and caused him [or her] injury." *Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 302 (Utah 1982). The burden is then shifted to the defendant "to demonstrate as an affirmative defense that under the circumstances his [or her] conduct, otherwise culpable, was justified and therefore privileged." *Id.* "The term 'purposely' [in section 766] meant that a defendant must not only have expected, or 'intended,' his [or her] conduct to interfere with plaintiff's contract or business relationship but that this interference must have been at least one purpose of the defendant's act." *Top Serv.*

*Body Shop v. Allstate Ins. Co.,* 283 Or. 201, 582 P.2d 1365, 1369 (1978) (footnote omitted). Thus, the purpose to interfere need not have been the defendant's "sole or paramount purpose." *Id.,* 582 P.2d at 1369 n. 6 (quoting Section 766 comment d at 55).

The comments to section 766 demonstrated the link between the defendant's purpose and possible privilege, stating that "the privileges to act in the manner stated in [that section] depend largely on the purposes of [the defendant's] conduct." Section 766 comment m at 62. Furthermore, "[i]f the actor does not act for the purpose of advancing the interest for the protection of which the privilege is given, he [or she] is not exercising the privilege and is not protected by it." *Id.*

The first *Restatement of Torts* § 767 (1939) (first section 767) listed five factors to be applied to determine whether the defendant had a privilege to interfere:

> (a) the nature of the actor's conduct,
>
> (b) the nature of the expectancy with which his [or her] conduct interferes,
>
> (c) the relations between the parties,
>
> (d) the interest sought to be advanced by the actor and
>
> (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.

According to the commentary, "[t]he issue in each case is whether the actor's conduct is *justifiable under the circumstances;* whether, upon a consideration of the relative significance of the factors involved, his [or her] conduct should be permitted despite its expected effect of harm to another." First section 767 comment a at 63 (emphasis added).

Elements of certain recognized privileges were set forth in the first *Restatement of Torts* §§ 768 through 774 (1939), but the commentary pointed out that the list was not exhaustive. First section 767 comment a at 63–64. These privileges included the privilege of a competitor, the privilege of an actor with a financial interest in the business of the

---

**9.** *Restatement of Torts* § 698 (1939) "relate[d] to contracts and other relations looking forward to

marriage." *Restatement of Torts* § 766 comment a at 49 (1939).

person induced, the privilege of a person responsible for another's welfare, the privilege to influence another's business policy, the privilege to advise, the privilege to assert a bona fide claim, and the privilege to break any restriction violating public policy. *See id.*

The approach of the first *Restatement of Torts* was criticized as allowing actions to be brought for a broad range of ostensibly legitimate activities:

> The problem with the prima facie-tort approach is that basing liability on a mere showing that [the] defendant intentionally interfered with [the] plaintiff's prospective economic relations *makes actionable all sorts of contemporary examples of otherwise legitimate persuasion* .... The major issue in the controversy—justification for the defendant's conduct—is left to be resolved on the affirmative defense of privilege. In short, the prima facie approach to the tort of interference with prospective economic relations requires too little of the plaintiff.

*Leigh Furniture*, 657 P.2d at 303 (emphasis added). This definition also tended to "leave[ ] too much uncertainty regarding the requirements for a recognized privilege and the defendant's burden of pleading and proving these and other matters." *Id.* at 304 (citation omitted). In other words,

> [the prima facie] formula subjected the defendant to liability without first describing to him [or her] what was forbidden and what was permitted, and it added to this injury by putting the burden upon him [or her] to justify his [or her] conduct without specifying in any precise way what would amount to such a justification.

*Prosser and Keeton on the Law of Torts* § 129, at 983 (footnote omitted).

**10.** Under the *Restatement (Second) of Torts* § 766B (1977) (section 766B), "interference with [a] prospective contractual relation is intentional if the actor desires to bring it about or if he [or she] knows that the interference is *certain* or *substantially certain* to occur as a result of his [or her] action." Section 766B comment d at 22 (emphases added).

## VI.

Section 766B, relied on by Kutcher, modified the approach taken by the first *Restatement of Torts* and defined intentional interference with prospective contractual relations as follows:

> One who *intentionally*[10] *and improperly* interferes with another's prospective contractual relation (except a contract to marry) is *subject to liability*[11] to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> > (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> >
> > (b) preventing the other from acquiring or continuing the prospective relation.

(Emphases added.) Thus, the *Restatement (Second) of Torts* shifted the focus on the defendant's conduct from whether the conduct was "privileged" to whether the defendant acted "improperly."

As Prosser and Keeton observed,

> this formula might be read, as some of the cases imply, *to put the burden on the plaintiff in the first instance to show impropriety, and it is no doubt an improvement when so read.* But the [*Restatement (Second) of Torts*] refused to take a clear position on the point and other cases have left the burden upon the defendant to justify his [or her] conduct.[12]

*Prosser and Keeton on the Law of Torts* § 129, at 983–84 (footnotes omitted) (emphasis added).

Section 767 enumerated seven factors to be considered in determining whether the interference was "improper," which is defined as "culpable and not justified." *Restatement (Second) of Torts* Introductory Note to Chapter 37 at 6 (1977). Section 767 stated:

**11.** "[T]he expression, 'subject to liability,' ... mean[s] that the actor is liable if his [or her] conduct was a *legal cause* of the interference and he [or she] has *no defense* to the action." Section 766B comment a at 20 (emphases added).

**12.** For an explanation of this point, see the *Restatement (Second) of Torts* § 767 comment k at 38 (1977) (section 767), set forth in pertinent part in note 22, *infra.*

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

The change in emphasis from "privilege" to "improper" was explained as follows:

Unlike other intentional torts such as intentional injury to person or property, or defamation, *this branch of tort law has not developed a crystallized set of definite rules as to the existence or nonexistence of a privilege to act . . . . Because of this fact, [section 767] is expressed in terms of whether the interference is improper or not,* rather than in terms of whether there was a specific privilege to act in the manner specified. *The issue in each case is whether the interference is improper or not under the circumstances . . . .*

Section 767 comment b at 27–28 (emphases added).

The *Restatement (Second) of Torts* §§ 768 through 773 (sections 768 through 773) listed the same basic rules as set forth in the comparable sections of the first *Restatement of Torts*, with some modifications. In keeping with section 767's new focus on "improper" conduct, the rules set forth in sections 768 through 773 were no longer termed "privileges" and instead were phrased in terms of whether the defendant acted properly or improperly. The commentary to section 767, however, still employed the term "privileges":

In some situations the process of weighing the conflicting factors set forth in [section 767] has already been performed by the courts, and *incipient privileges and rules defining conduct as not improper are developing.* When this has been accomplished and the scope of the more or less crystallized rule or privilege has been indicated by the decisions, the responsibility in the particular case is simply to apply it to the facts involved; and there is no need to go through the balancing process afresh. *Some of the situations in which this development has occurred are stated in [sections 769 through 773 [13]].*

Section 767 comment j at 37 (emphases added). We find the term "privilege" useful to describe the defenses to the tort set forth in sections 768 through 773 and employ it in our analysis, *infra.*

The approach taken by the *Restatement (Second) of Torts* has not been free from objection. Specifically, the multiple-factor approach of sections 766B and 767 has been criticized as unworkable. *See, e.g., Ran Corp. v. Hudesman,* 823 P.2d 646, 648 (Alaska 1991) (recognizing that "while these factors are relevant in some or all of the incarnations of the interference tort, they are hard to apply in any sort of predictive way"); *Bar J Bar Cattle Co. v. Pace,* 158 Ariz. 481, 763 P.2d 545, 548 n. 2 (Ariz.Ct.App.1988) (noting that "the balancing process required by section 767 will, in some cases, present troublesome problems of predictability, and may make ascertaining a standard for future conduct difficult"); *Top Service,* 582 P.2d at 1371 n. 12 (explaining that "the 'factors' approach of section 767 . . . poses unresolved difficulties with respect to pleading, proof, and the function of the court and jury"); *Leigh Furniture,* 657 P.2d at 304 (rejecting

---

**13.** *Restatement (Second) of Torts* § 768 (1977) (section 768), which relates to "competition," was not included here.

Section 768 . . . deals specifically with the question of whether competition is a proper or improper interference with contractual relations, either existing or prospective. [*Restatement (Second) of Torts* §§ 769–773 (1977)

(s]ections 769–773[) ] deal with *other special situations* in which application of the factors enumerated in [section 767] have produced more clearly identifiable decisional patterns. Section 767 *comment a at 27* (emphasis added). From the foregoing, it appears that the situations in sections 768 through 773 all represent "privileges."

section 766B's definition because of its complexity).

### VII.

In *Top Service*, the Oregon Supreme Court adopted an alternative formulation that has been followed by several other states. *See, e.g., Blake v. Levy*, 191 Conn. 257, 464 A.2d 52, 55 (1983); *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 799–800 (Iowa 1984); *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 302 S.C. 265, 395 S.E.2d 179, 180 (1990); *Leigh Furniture*, 657 P.2d at 304. The Oregon court summarized its approach as follows:

> [A] claim [of intentional interference with contractual or other economic relations] is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. *[The] [d]efendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession.* No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant.

*Top Service*, 582 P.2d at 1371 (footnote omitted) (emphasis added).

Under this framework, there are six elements that a plaintiff must allege to "state a claim for intentional interference with economic relations":

> (1) the existence of a valid business relationship or expectancy, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to economic relations, and (6) damages.

*Uptown Heights Assoc. v. Seafirst Corp.*, 320 Or. 638, 891 P.2d 639, 646 (1995). Stated another way, the defendant must have had "a duty of non-interference":

> [T]o be entitled to go to a jury, [the] plaintiff must not only prove that [the] defendant intentionally interfered with his [or her] business relationship but also that [the] defendant had a duty of non-interference; *i.e.*, that he [or she] interfered for an improper purpose rather than for a legitimate one, or that [the] defendant used improper means which resulted in injury to [the] plaintiff.

*Straube v. Larson*, 287 Or. 357, 600 P.2d 371, 374 (1979).

As an alternative to proving "improper purpose," a plaintiff may show that the defendant acted by "improper means." *Top Service*, 582 P.2d at 1371. Improper means may be established "where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules." *Leigh Furniture*, 657 P.2d at 308. Improper means may include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Top Service*, 582 P.2d at 1371 n. 11 (citations omitted). "Means may also be improper or wrongful because they violate 'an established standard of a trade or profession.'" *Leigh Furniture*, 657 P.2d at 308 (quoting *Top Service*, 582 P.2d at 1371).

In this context, Oregon's approach "require[s] the plaintiff to allege and prove more than the prima facie tort [of section 766], but not to negate all defenses of privilege." *Id.* at 304. Therefore, "[a] plaintiff's burden in an intentional interference action is not to negate every possible proper basis for the defendant's actions. All that is necessary to prove improper means or [purpose] is evidence of *an* improper means or [purpose] that the jury can believe was *the* reason for the action." *Hickman Construc. v. South Umpqua State Bank*, 109 Or.App. 527, 820 P.2d 838, 841 (1991) (emphases in original).

The Alaska Supreme Court has noted that the Oregon definition "provides a clearer rule on which potential plaintiffs and defendants can rely in evaluating conduct."[14] *Ran Corp.* at 649 n. 4.

---

14. Although the Alaska Supreme Court acknowl-    edged that the Oregon rule may be "desirable," it

## VIII.

Our courts have recognized the tort of interference with *existing* contractual relations.[15] *See Lee v. Aiu*, 85 Hawai'i 19, 32, 936 P.2d 655, 668 (1997); *Beclar Corp. v. Young*, 7 Haw.App. 183, 193, 750 P.2d 934, 940 (1988); *Burgess v. Arita*, 5 Haw.App. 581, 594, 704 P.2d 930, 939, *reconsideration denied*, 5 Haw.App. 682, 753 P.2d 253 (1985). *Burgess* established the following elements for tortious interference with existing contractual relations:

> (1) a contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) the defendant's intentional inducement of the third party to breach the contract, (4) absence of justification on the defendant's part, (5) the subsequent breach of the contract by the third party, and (6) damages to the plaintiff.

*Burgess*, 5 Haw.App. at 594, 704 P.2d at 939 (citing 3 J. Dooley, *Modern Tort Law–Liability & Litigation* § 44.02 (B. Lindahl rev. 1984); *Bendix Corp. v. Adams*, 610 P.2d 24 (Alaska 1980)).

The Hawai'i Supreme Court has clarified the sixth element of this test, holding that "it is 'of the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer *damages as a consequence of the defendant's conduct*, and these damages cannot be speculative or conjectural.'" *Weinberg v. Mauch*, 78 Hawai'i 40, 50, 890 P.2d 277, 287 (quoting *Chemawa Country Golf v. Wnuk*, 9 Mass.App.Ct. 506, 402 N.E.2d 1069, 1072–73 (1980)) (emphasis added), *reconsideration denied*, 78 Hawai'i 421, 895 P.2d 172 (1995). Thus, although not expressly stated in the *Burgess* definition of the tort, "the defendant's intentional inducement of the third party to breach the contract," *Burgess*, 5 Haw.App. at 594, 704 P.2d at 939, must cause actual damages to the plaintiff. The supreme court emphasized that "the plaintiff must show that a breach has occurred *and* must separately establish damages. Damages are not inferred from the commission of the breach." *Weinberg*, 78 Hawai'i at 50, 890 P.2d at 287 (emphasis in original).

The above cases have not explicitly defined the respective burdens of proof for the plaintiff and the defendant, but we glean some guidance from this court's discussion of the third element of intentional inducement, which referred to *Chow v. Alston*, 2 Haw. App. 480, 634 P.2d 430 (1981). *Burgess*, 5 Haw.App. at 594, 704 P.2d at 939–40. In *Chow*, it was held that "[i]n order to establish a cause of action against a third party for intentional interference with a contractual right, it must be shown that the party acted with *intent and legal malice*, i.e., 'the inten-

---

was not adopted in *Ran Corp. v. Hudesman*, 823 P.2d 646 (Alaska 1991) because the "direct financial privilege" applied in that case. *Id.* at 649 n. 4. This privilege was defined as follows:

> "[W]here there is a direct financial interest in the contract, the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his [or her] economic interest, or whether it is motivated by spite, malice, or some other improper objective."

*Id.* at 649 (quoting *Bendix Corp. v. Adams*, 610 P.2d 24, 31 (Alaska 1980)).

**15.** The interests protected by this tort and by the tort of intentional interference with prospective *economic advantage* have been viewed as related:

> [T]he tort of intentional interference with contractual relations ... promotes an individual's security and integrity in his [or her] contractual relations by protecting those relations from wrongful intermeddling by third parties.
>
> A related interest, the individual's expectation of a fair opportunity to conduct legitimate business affairs free from wrongful intermeddling by others,[ ] is also widely protected in American jurisdictions, through the tort theory of intentional interference with prospective economic advantage. Under this theory, a person who is involved in an economic relationship with another, or who is pursuing reasonable and legitimate prospects of entering such a relationship, is protected from a third person's wrongful conduct which is intended to disrupt the relationship. The cause of action protects both continuing business or customary relationships not amounting to formal contracts, and prospective business or contractual relations which, absent interference, would culminate in pecuniary benefit to the plaintiff.

*Ellis v. City of Valdez*, 686 P.2d 700, 706–07 (Alaska 1984) (citations and footnotes omitted) (emphases added). Hence, the tort of interference with prospective contractual relations is a sub-species of the broader tort of interference with prospective economic advantage. Because Kutcher's allegations would fit within the tort of interference with prospective contractual relations, we need not decide the scope of a broader tort here.

*tional doing of a harmful act without legal or social justification or excuse,* or, in other words, the wilful violation of a known right.' " *Chow,* 2 Haw.App. at 484, 634 P.2d at 434 (quoting 45 *Am.Jur.2d Interference* § 3, at 281 (1969)) (emphases added). This implied that the *plaintiff* must demonstrate that the defendant acted with intent and without justification. This construction of *Chow* is in accord with the view expressed in the commentary to section 767:

> [The tort of interference with contractual relations] is sometimes treated like the tort of negligence, with the result that *it is a part of the plaintiff's case to show all of the factors making the defendant's interference improper. This is especially true in jurisdictions where the courts speak of malicious interference and define it as meaning intentional interference without justification.*

Section 767 comment k at 38 (emphasis added).

### IX.

### A.

It is evident that "[t]he cause of action [for interference with prospective contractual relations] has run parallel to that for interference with existing contracts[,]" *Prosser and Keeton on the Law of Torts* § 130, at 1008, presumably because of the "related interest[s]," *Ellis v. City of Valdez,* 686 P.2d 700, 706 (Alaska 1984), protected by the two torts. As we have discussed, our jurisdiction has already adopted a test for the tort of interference with existing contractual relations. This test is easily modified to define the elements for the tort of interference with prospective contractual relations.

Accordingly, we hold that a plaintiff alleging the tort of interference with prospective contractual relations must plead and prove the following: (1) a prospective contractual relationship existed between the plaintiff and a third party; (2) the defendant knew of this relationship; [16] (3) the defendant intentionally interfered with the plaintiff's prospective contract; [17] (4) the defendant acted without proper justification; [18] (5) the defendant's interference caused the third party to fail to consummate the prospective contract with the plaintiff; and (6) the defendant's interference caused damages to the plaintiff. *Cf. Burgess,* 5 Haw.App. at 594, 704 P.2d at 939.

### B.

The fourth element, that the defendant acted without proper justification, must be a part of the plaintiff's prima facie case. In this regard, we decline to follow the approach taken by the first *Restatement of Torts,* under which the plaintiff was required to plead and prove only that the defendant intentionally interfered and that such interference caused injury to the plaintiff. We agree that it "requires too little of the plaintiff[,]" *Leigh Furniture,* 657 P.2d at 303, especially in light of the indication from *Chow* that the plaintiff must show "intent" and "legal malice," i.e., intentional interference *without justification.*

Likewise, we do not accept the seven-factor analysis of section 767 as defining the plaintiff's burden in pleading and proving that a defendant acted without proper justification. As we have noted, the process of balancing the seven factors to determine whether the interference was "improper" has been criticized in other jurisdictions on the grounds that it is unpredictable and does not

---

**16.** We believe this element is satisfied by actual knowledge of the prospective contractual relation or by knowledge "of facts which would lead a reasonable person to believe that such interest exists." W.P. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts* § 129, at 982 (5th ed.1984) [hereinafter *Prosser and Keeton on the Law of Torts*].

**17.** A plaintiff may show that the defendant intentionally interfered by demonstrating that the defendant "act[ed] with knowledge that interfer-

ence [would] result[.]" *Id.* We concur with the proposition that the interference is intentional "if the actor desires to bring it about or if he [or she] knows that the interference is certain or substantially certain to occur as a result of his [or her] action." Section 766B comment d at 22.

**18.** While the phrase "without justification" may be sufficient to describe the fourth element, we add the term "proper" because it appears to be ensconced in the developing case law.

clearly delineate burdens of pleading and proof. *See supra* part VI.

### C.

Placing the burden on the plaintiff to demonstrate that the interference was without proper justification, however, leaves unanswered the question of precisely what the plaintiff must plead and prove.

■ The improper means or purpose formulation of the Oregon courts capsulizes the tort's development as one prohibiting tortious means of interference to one which also prohibits interference deemed unjustified, even in the absence of methods thought to be independently tortious. We believe, then as an initial premise, that a plaintiff may show that interference was without proper justification where the interference was "tortious, illegal, or unconstitutional[,]" *Prosser and Keeton on the Law of Torts* § 129, at 982 (footnotes omitted), and/or involved "violations of statutes, regulations, or recognized common-law rules[,]" [19] *Leigh Furniture*, 657 P.2d at 308, or "established standard[s] of a trade or profession[,]" *Top Service*, 582 P.2d at 1371 (footnote omitted).[20] We anticipate that many issues concerning the pleading and proof of unjustified interference will be resolved by resort to this general framework.

Beyond this initial premise, we are reluctant to specify and thus limit what may constitute unjustified interference under all circumstances. It has been recognized that "a rather formidable body of law has been erected" concerning interference with prospective contractual relations. *Prosser and Keeton on the Law of Torts* § 130, at 1005. Some attempts have been made to organize the cases dealing with interference with prospective contractual relations. In an American Law Reports annotation on the subject, cases are categorized according to what type of prospective contract was allegedly interfered with, and also according to some of the privileges that have been asserted.[21] *See* Annotation, *Liability of Third Party for Interference with Prospective Contractual Relationship Between Two Other Parties*, 6 A.L.R.4th 195, 196 (1981). Cases that have cited to the applicable sections of the *Restatement (Second) of Torts* have also been collected and summarized. *See Restatement (Second) of Torts* App. §§ 708–840E (1989). In 1995, the California Supreme Court noted that "close to a majority of the high courts of American jurisdictions have . . . explicitly approv[ed] a rule that requires the plaintiff in such a suit to plead and prove the alleged interference was either 'wrongful,' 'improper,' 'illegal,' 'independently tortious' or some other variant on these formulations." *Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740, 747 (1995). Thus, there is a burgeoning body of case law which may be consulted in determining whether a perceived interference is analogous to or has been found to be an interference which was without proper justification.

---

**19.** We believe the reference in *Top Serv. Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365 (1978) to interference involving "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[,]" *id.*, 582 P.2d at 1371 n. 11, may be subsumed under the violation of "recognized rule[s] of common law," *id.* at 1371 (footnote omitted).

**20.** Within this general framework we do not believe it necessary to place undue emphasis on whether the impropriety of the interference should be classified as to "means" or "purpose." Under the general framework set forth above, the violations described could conceivably involve an improper purpose and/or an improper means. *See Pratt v. Prodata*, 885 P.2d 786, 789 n. 3 (Utah 1994) (one justice expressing "grave doubts about the future vitality of [the] improper pur-

pose prong, especially in the context of commercial dealings").

**21.** The types of contracts include employment contracts; contracts for the sale of business, stock, or real property; construction or paving contracts; contracts for the sale, distribution, or manufacture of goods or products; lease or sublease agreements, or contracts for the sale of a lease; and loan or bonding agreements. Annotation, *Liability of Third Party for Interference with Prospective Contractual Relationship Between Two Other Parties*, 6 A.L.R.4th 195, 196 (1981) [hereinafter Liability of Third Party for Interference]. The privileges cited involve competition, financial interest, advice, assertion of a bona fide claim, public interest, person responsible for the welfare of another, and statements made by a member of a legislative body or made during a judicial or other official proceeding. *Id.*

### D.

By requiring the plaintiff to plead and prove the defendant acted without proper justification, we emphasize that we do not compel a plaintiff to "negate all defenses of privilege" and privilege will be an affirmative defense. *Furniture*, 657 P.2d at 304. Privilege and any other defenses ordinarily will not become an issue unless the plaintiff has demonstrated that a prima facie case exists, including that the defendant acted without proper justification. *See Top Service*, 582 P.2d at 1371; *Leigh Furniture*, 657 P.2d at 304.

### 1.

In discussing sections 768 through 773, the *Restatement (Second) of Torts* declined to determine "who has the burden of raising the issue of whether the interference was improper or not and subsequently of proving that issue[.]"[22] Section 767 comment k at 38. The *Restatement (Second) of Torts* suggests that the plaintiff "might" have the burden of pleading and proving the "culpability of the [defendant's] conduct in general" and the defendant, "its justification under the specific facts." *Id.* We believe that the "privileges" set forth in sections 768 through 773 of the *Restatement (Second) of Torts* are a suitable starting point to guide defendants as to what defenses they may assert against the tort. Thus, in our view, sections 768 through 773 can be raised as matters of defense to the tort in a way similar to that originally conceived under the first *Restatement of Torts*. Viewed in this way, the burdens of pleading and proof as between a plaintiff and a defendant are more clearly outlined.

The commentary to section 767 has characterized the rules set forth in these sections as "incipient privileges" which have been developed in cases dealing with the torts of intentional interference with existing and prospective contractual relations. Section 767

22. The *Restatement (Second) of Torts* did not establish a clear rule as to this issue:

[T]here is little consensus on who has the burden of raising the issue of whether the interference was improper or not and subsequently of proving that issue; and it can not [sic] be predicted with accuracy what rule will ultimately develop. *Instead of laying down a categoric rule for one position or the other,*

comment j at 37. Accordingly, we agree that when "the scope of the more or less crystallized rule or privilege has been indicated by the decisions, the responsibility in the particular case is simply to apply it to the facts involved[.]" *Id.* We note that even the Oregon courts, while not following the definition of the tort of interference with prospective contractual relations set forth in section 766B, have occasionally looked to the rules in sections 768 through 773 for guidance. *See, e.g., Ramirez v. Selles*, 308 Or. 609, 784 P.2d 433, 435 (1989) (discussing the privilege of a competitor); *Top Service*, 582 P.2d at 1371 ("Even a recognized privilege may be overcome when the means used by [the] defendant are not justified by the reason for recognizing the privilege. To this extent we agree with the analysis of the [*Restatement (Second) of Torts* ].") (citation and footnote omitted).

Because of the limited factual situation presented by the instant case, we do not regard it necessary or wise at this time to adopt as valid, without qualification, all of the rules of privilege set forth in sections 768 through 773 for all cases, nor do we mean to indicate that defendants may assert only the privileges set forth in those sections as defenses.[23]

### 2.

However, we conclude the privilege of communicating truthful information, set forth in section 772(a), is of particular significance to this case:

One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another *does not interfere improperly* with the other's contractual relation, *by giving the third person*

(a) *truthful information,* or

*therefore, it seems appropriate to draw a more particularized line depending upon whether the precise matter goes more specifically to the culpability of the actor's conduct in general or to its justification under the specific facts.*
Section 767 comment k at 38 (emphasis added).

23. See, e.g., Liability of Third Party for Interference *at 196 (summarizing cases involving defenses concerning the public interest and statements*

(b) honest advice within the scope of a request for advice.

(Emphases added.) In discussing section 772(a), the commentary provided:

> There is of course no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another. The interference in this instance is clearly not improper. This is true even though the facts are marshaled in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking his [or her] contract or refusing to deal with another. It is also true whether or not the information is requested.

Section 772 comment b at 50 (emphases added).

Comment b suggested "[c]ompar[ing] [section 772(a) to the Restatement (Second) of Torts] § 581A [ (1977) (section 581A) ], on the effect of truth in an action for defamation." Section 772 comment b at 50. The commentary to section 581A stated, "There can be no recovery in defamation for a statement of fact that is true, although the statement is made for no good purpose and is inspired by ill will toward the person about whom it is published and is made solely for the purpose of harming him [or her]." Section 581A comment a at 235. While section 581A concerns defamation, "it is probably safe to assume that occasions privileged under the law of defamation are also occasions in which interference with contract by legal means would

be considered justified." [24] Prosser and Keeton on the Law of Torts § 129, at 989 (footnote omitted).

We observe that truth was raised as a defense by Peluso and that the communication of truthful information is not deemed an improper interference under the Restatement (Second) of Torts sections relied upon by Kutcher. In any event, the privilege of communicating truthful information, as set forth in section 772(a), appears to be broader than that afforded by analogous privileges in defamation suits since the section 772(a) privilege extends to communicating truthful information "whether or not the information is requested." [25] Section 772(a) comment b at 50.

We conclude, then, that under the circumstances of this case, Peluso's communication of information to Tauchas was privileged because it was truthful, and thus Peluso cannot be held liable as a matter of law for any alleged intentional interference with Kutcher's prospective employment contract with Avis. Therefore, we affirm the court's grant of summary judgment in favor of Peluso, although we do so for other reasons. See Reyes v. Kuboyama, 76 Hawai'i 137, 140, 870 P.2d 1281, 1284 (1994) ("[W]here the circuit court's decision is correct, its conclusion will not be disturbed on the ground that it gave the wrong reason for its ruling.").

## X.

## A.

Kutcher essentially has argued that the court erred in granting summary judgment

---

made by a member of a legislative body or made during a judicial or other official proceeding).

24. Under certain circumstances, the First Amendment to the U.S. Constitution may restrict the liability of one who speaks the truth. Prosser and Keeton on the Law of Torts § 129, at 988. One commentator has also suggested that where "the communication of truthful information in a commercial setting is constitutionally protected, courts do not have the option of deciding, on public policy grounds, that one party should be subjected to tort liability for providing truthful information to another." Tucker, "And the Truth Shall Make You Free": Truth as a First Amendment Defense in Tortious Interference with Contract Cases, 23 Hastings Const. L.Q. 709, 739 (1997).

25. However, some commentators have concluded that, as a privilege against a defamation ac-

tion, "[i]t is permissible to warn a present or prospective employer of the misconduct or bad character of an employee[.]" Prosser and Keeton on the Law of Torts § 115, at 827 (footnotes omitted). Prosser and Keeton reject the idea that the information given concerning the prospective employee must have been requested in order for the qualified privilege to apply:

> It has been said that volunteered information is never privileged, and that it is privileged to the same extent as though it has been requested. It seems clear that neither statement is correct, and that while more in the way of good reason to speak may be required of a volunteer, the absence of a request is merely one factor to be considered, along with the importance of the interest to be protected and other elements, in determining the propriety of the defendant's conduct.

Id. at 828 (footnotes omitted).

because genuine issues of material fact existed as to whether Peluso's interference with Kutcher's prospective employment was intentional and as to whether Peluso acted with an improper purpose. He also maintains that it "can be established as a matter of law" that Peluso's interference caused Avis to decide not to hire Kutcher on a permanent basis. All of these arguments address elements of Kutcher's prima facie case.

We recognize that, as we have said, the question of whether the defendant's interference was privileged ordinarily does not become relevant until the plaintiff demonstrates the existence of a prima facie case. Also, if genuine issues of material fact exist concerning elements of the plaintiff's prima facie case, summary judgment would not be proper, *unless*, in any event, the defendant would be entitled to judgment as a matter of law. We believe that summary judgment was properly entered in favor of Peluso on the ground that, as discussed *infra*, there is no material factual dispute as to the accuracy of her account to Tauchas of Kutcher's behavior, and her conduct was privileged as a matter of law. Thus, we need not address the elements of Kutcher's prima facie case,[26] because even if we assume, *arguendo*, that genuine issues of material fact existed with respect to those elements, Peluso is entitled to judgment as a matter of law on the basis of her privileged conduct.

### B.

Addressing, then, the issue of whether Peluso's conduct was privileged, there appears to be no material factual dispute as to the truthfulness of Peluso's account to Avis.

### 1.

Kutcher does not dispute the essential facts of Zimmerman's account to Peluso of what occurred at the Kahului lab. Zimmerman testified in her deposition that she "told [Peluso] what happened" with Kutcher, including that "he[ ] [was] on his way to the [Wailuku lab] and that he[ ] [was] upset[;] he was going to come over there and have it

done." According to Peluso, Zimmerman told her the following:

> She told me that [Kutcher] had a drug screening appointment, and that he had come in, that he had been a long time in the bathroom, and that she had to knock and ask if he was okay, that he didn't have enough sample, that he had become very upset with her, was yelling at her, had grabbed the paperwork from her, and then said he was going to come to the [Wailuku lab] to do the specimen.

Kutcher did not submit any affidavit disputing this rendition of what occurred. In his answering brief, Kutcher stated that he went to CLH for a drug screening test, Zimmerman knocked on the bathroom door, he produced only 40 c.c.s of urine for the test, Zimmerman told him that 60 c.c.s of urine would be required, he "became very upset and began protesting loudly that he was being treated unfairly[,]" he then "demanded his paper work, which Zimmerman gave to him, and he left the building stating that he was going over to [the Wailuku lab] and would have the test done there."

Comparing these accounts, there is no question concerning whether Zimmerman's account to Peluso was a truthful and accurate representation. Kutcher does not deny Zimmerman's assertion that he was in the bathroom "a long time," and he essentially affirms everything else that Zimmerman reportedly told Peluso.

### 2.

There also does not appear to be a genuine issue of material fact concerning the truthfulness of what Peluso communicated to Tauchas. Peluso testified that she told Tauchas the following:

> I told her that, you know, like I stated, that [Kutcher] had been at [the Kahului lab] and that he had not given a specimen, first of all. I had told her that—let's see— he had been over at [the Kahului lab]; he had been in the bathroom for 10 to 15 minutes—or a long time, I think, is [sic] exactly the words that I used; and that a lab assistant had to go try and get him,

---

26. We also need not and do not address the unrelated issues of whether Kutcher was treated

fairly at CLH, or whether Avis acted reasonably in not hiring him.

find out if he was okay; and that he had become upset with our lab assistant at that point; and that when he came out, there wasn't enough specimen; and that he started yelling at the lab assistant, grabbed his papers out of her hands, and had said he was going to go to the [Wailuku lab]; and then he left; and at that point in time, had not arrived at the [Wailuku lab] yet.

Correspondingly, Tauchas testified the call she received from Peluso was as follows:

A. [Tauchas] I remember receiving a phone call from a woman. I remember that she indicated that the applicant was in the restroom for a period of time. The nurse became concerned, because he was there for a period of time, and knocked on the door. At that point, she indicated that there was some type of confrontation.

Q. [Defense Counsel] I'm sorry, between the nurse and the person [Kutcher]?

A. Yes.

Q. Okay.

A. This was at the Kahului [lab]. I recall that he left. I was told that he left the clinic and did not give a specimen [at the] Kahului [lab],[27] and that he was going to go to the Wailuku [lab].

27. Although Kutcher has represented before the court and again on appeal that Peluso told Tauchas that Kutcher "had refused to complete" the drug test, Peluso did not testify to that effect in the portion of her deposition contained in the record. Instead, Peluso stated that she could not remember whether she told Tauchas that Kutcher had not given any sample or that he had not given an "acceptable" sample.

Any ambiguity as to whether Tauchas understood that no sample was provided or an inadequate sample was provided did not appear to enter into Tauchas's decision not to employ Kutcher. Tauchas testified that in making her decision, one of her "concerns" was that "[Avis did not] have drug test results" for him. An employee of the Wailuku lab called Tauchas the day of or the day after the incident to inform her that Kutcher had given a complete sample at Wailuku, but Tauchas instructed the lab not to process it because her understanding was that samples from Avis's "prospective applicants" were required to be obtained at the Kahului lab. Hence, Kutcher's drug test at the Kahului lab location was what concerned Tauchas, not whether he had "refused" to give any sample or that he had given an inadequate sample.

Thus, the testimony by Tauchas concerning what Peluso told her substantially verified what Zimmerman testified she told Peluso.

### 3.

We observe that no evidence was submitted contradicting that Peluso's call to Avis was, as she testified, pursuant to CLH's standard procedure to advise the company that arranged the drug test that the test had not been completed adequately.[28] Ultimately some communication would have been required between CLH and Avis as to the uncompleted test. In that regard, Peluso's communication of the circumstances surrounding the test would be relevant to explaining why an acceptable specimen had not been obtained at the Kahului lab.

### C.

We conclude, then, that the communication of truthful information was a privilege protecting Peluso in this case. However, because we cannot foresee all of the varied circumstances in which the privilege of communicating truthful information may be asserted, we decline to adopt it as a privilege, without qualification, in all contexts. The development of this privilege, as with all privileges to interfere with a prospective con-

In any event, Kutcher does not argue that a misunderstanding, if any, as to the sample obtained affected Tauchas's decision. Rather, Kutcher's position on appeal is that Tauchas's decision not to employ him was based on a concern that he would treat Avis's employees or customers in the same way he had treated Zimmerman. Accepting this argument, information about Kutcher's specimen itself was not a material fact bearing upon Tauchas's decision not to employ Kutcher.

28. While Peluso would not usually be the CLH employee to communicate this information, her supervisor was not at the Millyard lab at that time. The facts that Peluso had previously called only one other employer and that she had not spoken to Tauchas before would not appear to raise genuine issues of material fact. Furthermore, in the absence of any knowledge by Tauchas that she was aware of CLH procedures, the facts that Tauchas thought it unusual for CLH to call her or that Peluso's call was the first time she had contact with anyone from CLH would also not appear to raise genuine issues of material fact.

tractual relation, must be left to some extent for later courts, with the benefit of different factual situations to examine, to refine.

## XI.

Accordingly, we affirm the court's March 27, 1996 order granting summary judgment in favor of Defendants and the corresponding April 11, 1996 judgment.