122 P.3d 1133

MERIDIAN MORTGAGE, INC.,
Plaintiff–Appellant,

v.

FIRST HAWAIIAN BANK, a Hawaii
Corporation, Defendant–
Appellee,

and

John and Jane Does 1–10; Doe Business
Entities 1–10; and Doe Governmental
Entities 1–10, Defendants.

No. 25799.

Intermediate Court of Appeals of Hawai'i.

Oct. 12, 2005.

As Corrected Oct. 13, 2005.

Certiorari Denied Nov. 21, 2005.

As Corrected Jan. 4, 2006.

James J. Bickerton, Honolulu, (K. Bartlett Durand, Jr. with him on the briefs), Bickerton Saunders & Dang, on the briefs, for Plaintiff–Appellant.

Carter K. Siu, Honolulu, (John T. Komeiji, Randall Y. Yamamoto, Honolulu, and Patsy H. Kirio with him on the brief), Watanabe Ing Kawashima & Komeiji, on the briefs, for Defendant–Appellee.

FOLEY, Acting C.J., FUJISE, J., and Circuit Judge CHAN in Place of LIM, J., Recused.

Opinion of the Court by FOLEY, J.

Plaintiff–Appellant Meridian Mortgage, Inc. (Meridian) appeals from the Final Judgment filed on April 30, 2003 in the Circuit Court of the First Circuit (circuit court).[1] The circuit court entered judgment in favor of Defendant–Appellee First Hawaiian Bank (FHB) against Meridian as to all of Meridian's claims. Meridian contends on appeal that the circuit court erred by granting summary judgment in favor of FHB. We disagree and affirm the Final Judgment.

## I.

### A. Factual History

In 1999, TT Keaau, Inc. (TTK) was attempting to refinance a past-due mortgage loan that Kona Village Associates (KVA) had with Long Term Credit Bank of Japan.[2] TTK owned 60% of KVA, which was a partnership that held the leasehold right and the ownership of Kona Village Resort (KVR).[3]

In March 1999, various FHB employees were contacted by representatives of Tokyo

---

1. The Honorable Gary W.B. Chang presided.

2. TT Keaau, Inc. (TTK) was owned 70% by Tokyo General Corporation (Tokyo General) and 30% by Taiyo General. Tokyo General was part of a group of companies known as the General Group; Tokyo General and General Group were both chaired by Katsumi Iida (Iida).

3. The names TTK, Kona Village Associates (KVA), Kona Village Resort (KVR), Kona Village, and Kona Village Hotel are used interchangeably throughout the record on appeal and in the briefs.

General Corporation (Tokyo General) and TTK/KVA/KVR with respect to obtaining a refinancing loan. FHB had a prior business relationship with either TTK or KVA; the relationship consisted of business checking accounts and credit card merchant services for Kona Village Hotel. Eventually, the FHB senior vice-president/regional manager for the Island of Hawai'i met with the "controller" of KVR, and the FHB senior vice president/deputy manager of the commercial real estate division met with the general manager of Kona Village. These discussions did not lead to a financial transaction.

Thereafter, Michael Nagumo (Nagumo), an officer of Tokyo General, asked Henry Fong (Fong) to help find a refinancing loan. Fong was vice-president of TTK. Fong contacted Jerry Park (Park), the president of Meridian.

On or about June 25, 1999, representatives of Meridian and TTK signed a "Real Estate Financing Agreement" (REFA). The REFA provided in relevant part:

1. **Exclusive Right to Procure:** [TTK] ... ("Client") hereby grants MERIDIAN MORTGAGE, INC., ... ("Broker"), the exclusive right to procure a real estate financing commitment, including debt, equity, joint venture, guarantee, sale of notes and mortgages and/or loans or any other type of financing (the "Commitment") from any investor, lender, and/or insurance company listed on the attached Exhibit "A" (an "Investor") upon terms acceptable to Client. The term of this Agreement shall start on the date of execution by Client and terminate at midnight, 180 days thereafter (the "Term").

2. **Financing Placement Fees:** Client agrees to pay Broker a financing placement fee equal to the two (2)% [sic] of the gross amount of the Commitment, including any earnouts (the "Fee"). Client agrees that the fee shall be fully earned when a Commitment is procured from an Investor listed on Exhibit "A" by Broker, Client, or any other person, and delivered to Client during the Term, and is thereafter accepted by Client.

. . . .

9. **Other Investors:** Upon execution of this Agreement, Client shall refer all pending and future negotiations to Broker and conduct such negotiations only through

Broker. Broker has the right, from time to time, to identify additional investors and to amend Exhibit "A" by the addition of such investors.

10. **Current Investor:** If, during the Term, Client accepts a Commitment from any current investor not on the list described in Exhibit "A", including a refinancing extension, or modification of debt, which replaces the Commitment to be procured by Broker, under this Agreement, then the Client shall pay to Broker one-half of the Fee specified in Section 2 above upon the closing of such Commitment.

It is unclear whether the aforementioned "Exhibit A" was attached to the REFA; it does not appear in the record before this court. Park subsequently sent two Memorandums of Agreement to Fong, adding several lenders: Merrill Lynch—Western Region, FINOVA Capital Corp., Banc One Commercial Mortgage, JT Capital, SWH Funding, Salomon Brothers—New York Office, and Paine Webber—New York Office.

Fong understood the terms of the REFA to mean that if TTK entered into negotiations with anyone else during the term of the REFA, TTK would have to refer those negotiations to Park. Fong also understood that Meridian had the right to add new lenders to Exhibit A at any time.

In September or October 1999, Kinsuke Hosogai (Hosogai), the vice-president/manager of Japan Business Development at FHB, made a courtesy visit to Katsumi Iida (Iida), the president and chairman of Tokyo General, to ask how FHB could be of assistance with Iida's business in Hawai'i. Iida told Hosogai that he was still looking for a lender to refinance the KVR loan.

After meeting with Iida, Hosogai spoke with John Landgraf (Landgraf), executive vice-president of FHB. Hosogai communicated to Landgraf that Iida needed a loan secured by the end of the calendar year and had been unable to obtain one. Hosogai asked if FHB could help Iida find financing for KVA, and Langraf advised Hosogai that FHB would not reconsider being a direct lender, but would be willing to possibly introduce Kona Village to another lender. It was Landgraf's understanding that Hosogai would communicate that to Iida.

Landgraf then contacted Gary Pinkston (Pinkston), the owner of MP Financial Group Limited dba Meridian Pacific Limited (MPFG) (no relation to Plaintiff–Appellant).[4] Landgraf communicated to Pinkston that the amount of the loan request was larger than FHB would consider and the leasehold nature of the property was not acceptable to FHB.

Prior to Landgraf's contact with Pinkston, Pinkston's office had "cold-called" Fong in July 1999. At Pinkston's instruction, Pinkston's staff routinely made calls to all the major hotels in Hawai'i to solicit loan business. Pinkston's office had called Fong to ask if the Kahala Mandarin Oriental Hotel needed any financing help.[5] Fong informed Pinkston's office that he did not need anything for the Kahala Mandarin, but he had another project that might need financing. Pinkston and Fong met at the Kahala Mandarin, and Fong revealed he was looking for financing for Kona Village. Fong also informed Pinkston that he was working with Park and suggested that Pinkston contact Park.[6] Pinkston called Park, but his call was never returned. It appears there was no further contact between Pinkston and Park.

In September 1999, Fong met with Hosogai and thereafter began supplying FHB with financial information about Kona Village Resort and KVA.

On or about October 15, 1999, Landgraf sent a confirmation letter to Pinkston, stating:

> Tokyo General Corporation is seeking $25 million in connection with its Kona Village Resort project. Funds will be utilized to pay down an existing note with Long Term Credit Bank of Japan, $12 million, and to buy out the minority partner's 40% [sic] interest in the property, $13 million.
>
> . . . .
>
> This will confirm our agreement and fee arrangement to equally split all loan fees collected in connection with this loan between First Hawaiian Bank and [MPFG].

On or about November 19, 1999, an employee of FHB faxed to Fong a draft of a term sheet with the instructions that "[t]he term sheet is 'for your eyes only' as it has not been reviewed by our lending administration." The draft term sheet was marked on the bottom of each page, "[f]or discussion purposes only. This is not an extension of a commitment by the Bank." The draft term sheet outlined in relevant part:

REQUEST: $25,000,000.00—term loan to refinance existing debt, bifurcated as follows:

1) $15,000,000— commercial mortgage loan
2) $10,000,000— term loan supported by a standby letter of credit issued by a "AAA" rated U.S. bank acceptable to FHB.

. . . .

FEE: 1) 2% of the loan amount ($30,000)
2) 1% of the loan amount ($10,000)

By November 23, 1999, Credit Suisse First Boston Mortgage Capital LLC (Credit Suisse) had indicated to Pinkston that it

---

**4.** MP Financial Group Limited (MPFG) was a Nevada corporation with an office in California. With respect to the lending side of real estate, MPFG was engaged in the business of advising pension funds and originating loans. As a loan originator, MPFG was the lender of record at closing at least 50% of the time. However, at closing, MPFG would sell the loan to another institution.

**5.** Iida was the individual owner of Kahala Royal Corporation, which was the owner of 59% of the Kahala Mandarin Oriental Hotel. Henry Fong (Fong) was also a vice president of Kahala Royal Corporation.

**6.** It is unclear from the record what information Fong communicated to Gary Pinkston (Pinkston) about Jerry Park (Park). Pinkston's deposition indicated that Fong relayed he was working with an old friend (Park) who was a residential banker, but there was no mention of a formal agreement between Fong and Park. Fong's deposition indicated he informed Pinkston that there was an "engagement agreement" with Park, but Fong was unsure whether he told Pinkston it was exclusive.

would fund the loan to KVA subject to all the "normal reviews."

On or about November 23, 1999, MPFG faxed to Landgraf a financing proposal for Kona Village Resort. Landgraf was MPFG's contact person for TTK/KVA. On or about November 26, 1999, Landgraf faxed the proposal back to MPFG with the notation, "[p]er our discussions, I changed the marked sections." The MPFG proposal that Landgraf faxed back [7] stated in relevant part:

The following is a summary of terms and conditions on which MP Financial Group, Ltd./First Hawaiian Bank, its successor, assign or designee ("Lender") proposes to provide a loan (the "Loan") to Kona Village Associates or an affiliate thereof ("Borrower") with respect to the above-referenced property [Kona Village Resort] (the "Property"). This proposal is subject to completion of due diligence and the issuance of a Commitment, as set forth herein.

. . . .

Principal Amount: $18,000,000 to
 $22,000,000

. . . .

Origination Fee: 2–2.5% of the Principal Amount, payable at closing.

The figures "2–2.5%" were circled. Landgraf forwarded the proposal to Nagumo and summarized the application, indicating the loan amount was for $18–22 million and the loan fees were 2–2.5 points.[8]

Sometime after MPFG sent its proposal, Fong informed Landgraf that TTK/KVA had an agreement with another entity to help procure a mortgage loan and TTK/KVA had to pay the other party a fee. Fong characterized his problem in a manner that indicated to Landgraf that Fong "was responsible for having made arrangements with another party and that he was—wasn't certain that his principals were even aware that they had this obligation." Landgraf and Fong had several conversations about Fong's problem of having to find a way to pay Meridian, Credit Suisse, FHB, and MPFG. FHB was "concerned that appropriate disclosures were

not made by the applicant earlier in the process of the negotiations or discussions." FHB anticipated that Credit Suisse "ultimately upon agreeing to make the loan would want to have all other claims for fees properly resolved and paid or canceled" and informed Fong of this anticipation. FHB encouraged Fong to settle his agreement with the other party.

In late November/early December 1999, Fong approached Park and told him that "we must have the funding or we must have the mortgage obtained because the pressure from Japan is growing and growing that we . . . have to resolve the Long Term Credit Bank problem." TTK asked to cancel the REFA in exchange for payment of 1% of the loan amount. On January 6, 2000, a Settlement Agreement was signed by representatives of Meridian and KVA. The Settlement Agreement stated in relevant part:

WHEREAS, Broker [Meridian Mortgage, Inc.] and TT Keaau, Inc., as General Partner of Borrower [Kona Village Associates], entered into that certain Real Estate Financing Agreement dated June 25, 1999 (the "Original Agreement"); and

WHEREAS, the Original Agreement provided that Broker had the exclusive right to procure a real estate financing commitment for Borrower during the period commencing on June 25, 1999 ending on December 22, 1999 and that during that period, Borrower would refer all negotiations for a financing commitment to Broker; and

WHEREAS, Borrower sought financing from lenders not procured by Broker during the term of the Original Agreement; and

WHEREAS, Broker and Borrower are willing to compromise and settle all matters relating to Broker's and Borrower's performance under the Original Agreement.

NOW THEREFORE, in consideration of the premises and other good a [sic] valuable consideration, receipt of which is

---

7. Only the first page of the proposal appears in the record on appeal. According to Pinkston's deposition, it appears the original document was about nine pages long.

8. "Points" and "%" are used interchangeably throughout the record.

acknowledged, Broker and Borrower agree as follows:

. . . .

2. *Payment of Loan Fee.*

a. If Borrower procures a commitment for a mortgage loan to be secured by its interest in the property commonly known as Kona Village Resort (the "Property") from Credit Suisse First Boston Mortgage Capital LLC, and such loan closes and is funded on or before February 29, 2000, then upon the funding of such loan, Borrower shall pay to Broker a fee of $80,000.

b. If on or before June 19, 2000, Borrower procures a commitment for a mortgage loan to be secured by the Property from any entity listed on Exhibit A attached hereto, then upon the funding of such loan, Borrower shall pay to Broker a fee of two percent (2%) of the amount of such commitment.

. . . .

6. *Miscellaneous.*

. . . .

f. *Entire Agreement.* This Agreement, with exhibits, supersedes any prior agreements and contains the entire agreement of the parties and all representations with respect to the subject matter hereof. Any prior correspondence, memoranda or agreements are replaced in total by this Agreement and exhibits hereto.

In the meantime, on or about December 14, 1999, Credit Suisse sent a letter agreement and Term Sheet to KVA, care of Pinkston. The letter agreement stated in relevant part:

The purpose of this letter is to set forth the terms and conditions to be submitted to the investment committee of Credit Suisse First Boston Mortgage Capital LLC ("CSFB", CSFB, its affiliates, including Meridian Pacific, Ltd. and their respective successors and assigns are hereinafter collectively referred to as the "Lender") in connection with the proposed interim financing (the "Interim Financing") which Kona Village Associates (the "Borrower") has requested to be provided by Lender. The terms and conditions of the Interim Financing to be considered shall be those set forth herein, as supplemented by the terms and conditions set forth in the term sheet attached hereto as Exhibit A, which term sheet is incorporated into, and made a part of, this letter.

. . . .

*Borrower hereby acknowledges and represents that it is working solely with Lender to procure the Interim Financing for the Property [Kona Village Resort] and agrees not to, and will cause its principals and affiliates to not, [sic] obtain or attempt to arrange a financing for the Property* (whether in the form of a permanent mortgage, bridge financing or otherwise) *with any party other than Lender.*

. . . .

*The Borrower represents that no other person or entity is entitled to any advisory or brokerage fee in connection with the Interim Financing,* and agrees to indemnify and hold CSFB and its affiliates harmless from and against any claims for a commission, finder's fee and other payments no matter how described, and against any and all costs and expenses, including attorneys' fees, relating to any such claim.

. . . .

. . . Please acknowledge your acceptance of the terms and conditions relating to the Interim Financing described herein by executing a copy of this letter. This letter must be executed and submitted by the Borrower by December 17, 1999 or this letter shall automatically terminate and be considered null and void.

(Emphasis added.)

The attached Term Sheet, "Exhibit A," included the following relevant terms: a loan amount no greater than $19,750,000 and an origination fee of 2.5% (crossed out by an unknown entity at an unknown date and replaced with 3.5%). The letter agreement and Term Sheet were forwarded to Landgraf by MPFG. On or about December 14, 1999, Landgraf forwarded the documents to Iida and, in a cover letter, wrote:

Attached is a final application for mortgage financing of the Kona Village Hotel arranged by First Hawaiian Bank and Meridian Pacific, Ltd., through Credit Suisse First Boston. In addition to the terms and

conditions contained therein, please note that the total loan Origination Fee will be 3.5%, which includes .5% each to First Hawaiian Bank and Meridian Pacific, Ltd.

On or about December 15, 1999, Nagumo faxed to Hosogai an acknowledgment of receipt of the final loan application documents. Nagumo made a counter-offer on a few of the terms, including a loan fee of 3% instead of 3.5%, and asked Hosogai to "[p]lease negotiate [Credit Suisse] portion of fees by 0.5%."

On or about December 16, 1999, Nagumo sent Credit Suisse a letter forwarding the December 14, 1999 letter agreement between Credit Suisse and KVA, executed by Iida. Nagumo wrote:

The letter agreement was executed by Mr. Iida upon the understanding that no later than December 22, 1999, [Credit Suisse] will deliver to [KVA] a letter stating that (a) no later than December 31, 1999, [Credit Suisse] will issue to [KVA] a binding loan commitment for the loan described, and upon the terms and conditions set forth, in the letter agreement, and (b) no later than January 15, 2000, such loan will close.

On or about December 17, 1999, Landgraf wrote a letter to Iida, which letter stated in relevant part:

If you will sign and accept [Credit Suisse's] December 14, 1999 letter as issued and deliver it to [Credit Suisse], the letter will be countersigned and returned to you. When duly executed, the December 14, 1999 letter is [Credit Suisse's] commitment to you for a loan subject to the terms and conditions therein contained. Please have your representative coordinate the exchange of signatures at Kona Village Resort this weekend where [Credit Suisse's] representatives are present.

The letter provides for loan closing prior to February 11, 2000. As a practical matter, the lender will close as soon as you, the Borrower, complies with its conditions to the makin [sic] of the loan. If you meet all the terms and conditions of their letter by January 15, 2000 they would proceed to close and fund your loan at that time. The timing of the closing is conditional on your ability to complete the delivery of documentation and information satisfactory to the lender.

In a January 13, 2000 letter to Nagumo, Landgraf wrote:

As you know, First Hawaiian Bank and [MPFG] are actively facilitating the [Credit Suisse] due diligence for a January 27, 2000 scheduled closing of the $19,750,000 loan to Kona Village Associates.

This letter serves to confirm and instruct escrow of your agreement to pay First Hawaiian Bank and [MPFG] each a .5% loan fee ($98,750) from escrow loan closing proceeds pursuant to my letter dated December 14, 1999 to Mr. Katsumi Iida (attached).

On the bottom of the letter appears the text "AGREED:" followed by a signature of "Mike Nagumo" and dated "Jan 14, 2000" in the same handwriting.

The sum of $80,000 (the amount owed to Meridian if the loan closed by February 29, 2000) was withheld in escrow. The loan with Credit Suisse did not close by February 29, 2000, and Meridian did not receive any payment from TTK. TTK took the position that it was not obligated to pay the $80,000 to Meridian.

## B. Procedural History

On October 22, 2001, Meridian filed its Complaint against FHB, alleging: (1) tortious interference with contractual relations, (2) tortious interference with prospective business advantage, and (3) common law unfair competition. The first two allegations were based on TTK's alleged breach of the REFA. Meridian also made a claim for punitive damages based on the aforementioned allegations. The Complaint was served on FHB on January 9, 2002, and FHB filed its Answer on January 29, 2002.

On August 12, 2002, FHB filed a "Motion to Dismiss, or in the Alternative, for Summary Judgment" (Motion to Dismiss/SJ). FHB argued: (1) Meridian could not proceed on its tortious interference with contractual relations claim because (a) it did not plead and could not prove FHB induced TTK to breach the REFA and (b) the Settlement Agreement superseded and rendered inad-

missible the REFA; (2) for the same reasons as the tortious interference with contractual relations claim, Meridian's claim for tortious interference with prospective business advantage failed; (3) Meridian could not plead or prove a claim for common law unfair competition because Meridian did not allege that FHB had palmed off its services as anyone else's, had misrepresented itself, or had unfairly invaded or interfered with Meridian's property or merchandise; and (4) without an actionable tort, Meridian had no claim for punitive damages.

On October 21, 2002, Meridian filed its "Memorandum in Opposition to Defendant First Hawaiian Bank's Motion to Dismiss, or in the Alternative, for Summary Judgment, Filed August 12, 2002" (Opposition Memorandum). In its Opposition Memorandum, Meridian argued: (1) triable issues of fact existed with regard to FHB's interference with the REFA; (2) the parol evidence rule did not bar the admissibility of the REFA because (a) Meridian was not offering the REFA as a challenge to the Settlement Agreement, but as the agreement whose breach was induced and (b) the parol evidence rule is not available to those not a party to the contract in question; (3) triable issues of fact existed with regard to Meridian's tortious interference with prospective business advantage claim; (4) FHB's narrow view of the law of unfair competition was wrong and Meridian had properly pleaded its unfair competition cause of action; (5) underlying claims existed to support Meridian's claim for punitive damages; and (6) the circuit court should deny FHB's motion to allow Meridian an opportunity to complete its discovery.

On October 23, 2002, FHB filed its "Memorandum in Reply to Plaintiff Meridian Mortgage, Inc.'s Memorandum in Opposition to Defendant First Hawaiian Bank's Motion to Dismiss, or in the Alternative, for Summary Judgment, Filed 8/12/02" (Reply Memorandum). In its Reply Memorandum, FHB asserted that Meridian "failed to present specific facts evincing that any act of [FHB] induced or otherwise caused TT Keaau to breach the [REFA] or interfered with any prospective business advantage held by [Meridian]" and offered no evidence that FHB misappropriated any work product owned by

Meridian. FHB concluded it was entitled to summary judgment as a matter of law on all counts of Meridian's Complaint.

On February 28, 2003, Meridian filed a supplemental memorandum in opposition to the Motion to Dismiss/SJ. FHB filed its supplemental reply memorandum on March 5, 2003.

The hearing on the Motion to Dismiss/SJ was held on March 10, 2003. At the conclusion of the hearing, the circuit court stated:

Turning to the first question of whether or not the settlement agreement had any effect upon the instant action, the Court looked closely at the language, comparing both the original agreement and the settlement agreement, and the Court notes that in the original agreement, it was talking about the brokerage arrangement.

And in paragraph 13, they have the integration clause, and they use the phrase, regarding the subject matter. And if I look at the settlement agreement in paragraph 6 F, I also find that language, the subject matter hereof.

And more interestingly enough in the settlement agreement, there's a second sentence in paragraph 6 F, and that is a sentence that is unlike your classic integration agreement and unlike the language in paragraph 13 of the original agreement, and that sentence reads as follows:

"Any prior correspondence, memoranda or agreements are replaced in total by this agreement and exhibits hereto."

Replacing other agreements in total is very significant in this Court's mind because it emphasizes what is being superseded by the settlement agreement, and the Court believes that language is referring back to the original agreement.

There is also attached to the settlement agreement, an Exhibit A that is referred to in paragraph 2 B, and so the structure of this settlement agreement goes a little bit beyond what might be a mere settlement of a disputed claim, but the Court believes that became in the nature of an accord that superseded the original agreement.

That being the case, it is the settlement agreement, not the original agreement, that must form the basis for any tortious interference, whether it's contract or pro-

spective business opportunity, and the Court is unable to locate in the record any evidence or inference that First Hawaiian Bank did intentionally induce a breach of the settlement agreement.

And even if, in an abundance of caution, the original agreement were still in effect at the time of the alleged wrongful conduct by First Hawaiian Bank, the Court still is unable to find direct evidence or an inference supporting the contention that First Hawaiian Bank intentionally induced TT Keaau to breach its agreement with Meridian Mortgage.

Therefore, for these and any other good cause shown in the record, the Court will respectfully grant the motion to dismiss, which the Court treated as a motion for summary judgment.

On March 31, 2003, the circuit court filed its "Order Granting Defendant First Hawaiian Bank's Motion to Dismiss, or in the Alternative, for Summary Judgment, Filed 8/12/02" (Order Granting Summary Judgment). In its Order Granting Summary Judgment, the circuit court dismissed with prejudice any and all of Meridian's claims against FHB and entered judgment in favor of FHB and against Meridian.

On April 30, 2003, the circuit court filed its Final Judgment in favor of FHB. Meridian timely filed its Notice of Appeal.

## II.

■ "We review the circuit court's grant or denial of summary judgment de novo." *Querubin v. Thronas,* 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (quoting *Durette v. Aloha Plastic Recycling, Inc.,* 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004).)

■ The Hawai'i Supreme Court has often articulated that

summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The

evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Querubin,* 107 Hawai'i at 56, 109 P.3d at 697 (quoting *Durette,* 105 Hawai'i at 501, 100 P.3d at 71). "[A] 'genuine issue as to any material fact' ... under a conflict in the affidavits as to a particular matter must be of such a nature that it would affect the result." *Richards v. Midkiff,* 48 Haw. 32, 39, 396 P.2d 49, 54 (1964).

■ Hawai'i Rules of Civil Procedure (HRCP) Rule 56(e) provides in relevant part:

**Rule 56. Summary judgment.**

. . . .

(e) *Form of affidavits; further testimony; defense required.* ... When a motion for summary judgment is made ..., an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Thus, "[a] party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, 'nor is [the party] entitled to a trial on the basis of a hope that [the party] can produce some evidence at that time.'" *Henderson v. Prof'l Coatings Corp.,* 72 Haw. 387, 401, 819 P.2d 84, 92 (1991) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2727 (1983)).

## III.

### A. Tortious Interference with Contractual Relations

1. **The *Restatement (Second) of Torts* Has Not Been Expressly Adopted in Hawai'i as the Law of Tortious Interference with Contractual Relations.**

■ Meridian appears to contend that Hawai'i adopted the *Restatement (Second) of*

*Torts* (1979) with respect to the law of intentional interference with contractual relations. In its opening brief, Meridian no longer refers to "tortious interference with contractual relations" and "tortious interference with prospective business advantage" as such and now refers to the torts as "intentional interference with contractual relations" ("IICR") and "intentional interference with prospective economic advantage" ("IIPEA").

Meridian argues (1) "it is not necessary that there be an actual breach as opposed to mere non-performance" per the *Restatement (Second)* § 766, and (2) the court in *Robert's Hawaii School Bus, Inc., v. Laupahoehoe Transportation Co., Inc.,* 91 Hawai'i 224, 982 P.2d 853 (1999), "expressly adopted the *Restatement (Second) of Torts* Section 766B for the elements of the closely related tort of IIPEA," and since IICR and IIPEA share several common elements, "it would make no sense to follow the *Restatement* definitions of those elements in IIPEA cases but not in IICR cases." The portions of the *Restatement (Second)* utilized by Meridian include § 766, defining "Intentional Interference with Performance of Contract by Third Person," and § 767, providing "Factors in Determining Whether Interference is Improper."

As to Meridian's first argument, the Hawai'i Supreme Court in *Weinberg v. Mauch,* 78 Hawai'i 40, 890 P.2d 277 (1995), stated:

> [T]he requisite elements of tortious interference with contractual relations [are]: 1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part; *5) the subsequent breach of the contract by the third party;* and 6) damages to the plaintiff.... [I]t is of the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses.

*Id.* at 50, 890 P.2d at 287 (internal quotation marks and citations omitted; emphasis added). The court also emphasized that "the plaintiff *must show that a breach has occurred* and must separately establish damages." *Id.* (emphasis in original omitted; above emphasis added). It is quite apparent that under Hawai'i law a breach is required. This court declines to follow the *Restatement (Second) of Torts* in this respect.

As to Meridian's second argument, this court notes that the court in *Robert's Hawaii* cited to the *Restatement (Second) of Torts* (and 2 Joseph D. Zamore, *Business Torts* (1999)) to provide the context upon which the elements of tortious/intentional interference with prospective business advantage had evolved. *Robert's Hawaii,* 91 Hawai'i at 258, 982 P.2d at 887. The Hawai'i Supreme Court did not expressly adopt the *Restatement (Second)* as Meridian contends. Furthermore, as noted above, the elements of tortious interference with contractual relations have already been set out in *Weinberg,* and this court declines Meridian's overture to this court to depart from this precedent.

With regard to Meridian's invitation to this court to follow the *Restatement (Second)* § 767 with respect to defining "the absence of justification on the defendant's part," we look to *Kutcher v. Zimmerman,* 87 Hawai'i 394, 957 P.2d 1076 (App.1998). In *Kutcher,* this court was faced with formulating the elements for tortious interference with *prospective* contractual relations. For guidance, this court looked to the law of tortious interference with existing contractual relations, stating that "[i]t is evident that the cause of action for interference with prospective contractual relations has run parallel to that for interference with existing contracts, presumably because of the related interests protected by the two torts." *Id.* at 406, 957 P.2d at 1088 (internal quotation marks, citations, and brackets in original omitted).

In arriving at which approach to take in formulating the elements of the tort, this court first noted:

> [L]iability for interference with existing or prospective contractual relations may be imposed if a defendant acts for an improper purpose.
>
> Much of the case law has grappled with the unsettled question of what constitutes an "improper purpose" or similarly worded element. That question has proven much more difficult to delineate than the improp-

er means by which an interfering party will be held liable[.]

. . . .

Indeed, even with several attempts to define the term "improper purpose" by various authorities, . . . it is still an unresolved question, whenever the defendant has not simplified the matter by using illegal or tortious means of interference, as to what purpose or state of mind will be found *improper or unjustified* so as to furnish a basis for liability. On this central issue there is no firm answer, and no doubt a good deal of balancing of interests must take place in rendering any decision. *Id.* at 400, 957 P.2d at 1082 (internal quotation marks and citations omitted; block quote format changed; emphasis in original).

This court then examined each approach, one of which was the *Restatement (Second)*. This court explicated:

The approach taken by the *Restatement (Second) of Torts* has not been free from objection. Specifically, the multiple-factor approach of sections 766B and 767 has been criticized as unworkable. *See, e.g.,* [RAN] Corp. v. Hudesman, 823 P.2d 646, 648 (Alaska 1991) (recognizing that "while these factors are relevant in some or all of the incarnations of the interference tort, they are hard to apply in any sort of predictive way"); *Bar J Bar Cattle Co. v. Pace,* 158 Ariz. 481, [484 n. 2,] 763 P.2d 545, 548 n. 2 (Ariz.Ct.App.1988) (noting that "the balancing process required by section 767 will, in some cases, present troublesome problems of predictability, and may make ascertaining a standard for future conduct difficult"); *Top Service [Body Shop v. Allstate Ins. Co.,* 283 Or. 201, 210 n. 12,] 582 P.2d [1365,] 1371 n. 12 [ (1978) ] (explaining that "the 'factors' approach of section 767 . . . poses unresolved difficulties with respect to pleading, proof, and the function of the court and jury"); *Leigh Furniture [and Carpet Co. v. Isom,]* 657 P.2d [293,] 304 [ (Utah 1982) ] (rejecting section 766B's definition because of its complexity).

*Kutcher,* 87 Hawai'i at 403–04, 957 P.2d at 1085–86 (ellipsis in original). This court went on to reject the *Restatement (Second)* approach, stating "[a]s we have noted, the process of balancing the seven factors to

determine whether the interference was 'improper' has been criticized in other jurisdictions on the grounds that it is unpredictable and does not clearly delineate burdens of pleading and proof." *Kutcher,* 87 Hawai'i at 406–07, 957 P.2d at 1088–89.

The reasoning within *Kutcher* is particularly relevant to this discussion as this court engaged in an in-depth analysis of which approach to adopt. In *Robert's Hawaii,* the Hawai'i Supreme Court was not faced with a similar question of whether or not to adopt the *Restatement (Second)* and the factors ensconced in § 767. Based on the foregoing discussion, this court declines to adopt the *Restatement (Second)* § 767 factors in determining whether there was an absence of justification on the part of FHB.

## 2. The Circuit Court Did Not Err by Granting Summary Judgment to FHB on Meridian's Tortious Interference with Contractual Relations Claim.

■ This court now looks to whether the circuit court erred by granting summary judgment in favor of FHB with respect to Meridian's tortious interference with contractual relations claim.

As aforementioned, the elements of a tortious interference with contractual relations claim are:

1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part; 5) the subsequent breach of the contract by the third party; and 6) damages to the plaintiff.

*Weinberg,* 78 Hawai'i at 50, 890 P.2d at 287. This court in *Chow v. Alston,* 2 Haw.App. 480, 634 P.2d 430 (1981), stated:

In order to establish a cause of action against a third party for intentional interference with a contractual right, *it must be shown that the third party acted with intent and legal malice,* i.e., the intentional doing of a harmful act without legal or social justification or excuse, or, in other

words, *the wilful violation of a known right.*

*Id.* at 484, 634 P.2d at 434 (internal quotation marks and citation omitted; emphasis added).

Meridian's Complaint alleged in relevant part:

12. Prior to the expiration of the Agreement, Defendant commenced discussions with TT Keeau [sic], Inc. to enable Defendant to procure financing on behalf of TT Keeau [sic], Inc., as general partner of Kona Village Resorts [sic].

13. At the time that it commenced such discussions with TT Keeau [sic], Inc., Defendant was aware of the existence of the Agreement and the fact that Plaintiff has contractual rights thereunder and an expectation that said rights would ripen into a financial benefit.

14. *TT Keeau [sic], Inc. knew that it had violated the Agreement in that it had sought financing from lenders not procured by Plaintiff during the term of the Agreement.*

15. Defendant's contacts with TT Keeau [sic], Inc. led TT Keeau [sic], Inc. to abandon its agreement with Plaintiff and to seek financing through Defendant. Defendant introduced TT Keeau [sic], Inc. to Credit Suisse First Boston Mortgage Capital LLC, with whom TT Keeau [sic], Inc. ultimately secured financing.

. . . .

18. *Defendant was aware of the Agreement between Plaintiff and TT Keeau [sic], Inc. . . . and intentionally and unjustifiably induced TT Keeau [sic], Inc. to breach it.*

19. TT Keeau [sic], Inc. breached the Agreement.

20. The foregoing acts and communications by Defendant constitute the tortious interference with contractual relations.

(Emphasis added.)

The REFA, in pertinent part, provided that (1) Meridian had "the exclusive right to procure a real estate financing commitment . . . from any investor, lender, and/or insurance company listed on the attached Exhibit 'A'" and (2) TTK "shall refer all pending and future negotiations to [Meridian] and conduct such negotiations only through [Meridian]."

In Meridian's Opposition Memorandum, Meridian argued that FHB "induced TTK to breach the REFA by failing to disclose its negotiations with FHB as a lender." Meridian further argued:

The express terms of the REFA thus provided that Meridian could amend Exhibit "A" to add any new lender identified from any source. The plain objective of these provisions of the REFA was to ensure that Meridian would be advised of any other lenders so it could add them to Exhibit A of the REFA, serve as TTK's broker, and receive its commission.

In order for the REFA to function, TTK had to inform Meridian in a timely manner.

From the foregoing, it appears the breach complained of was TTK's alleged failure to refer its negotiations to Meridian and to conduct its negotiations only through Meridian.

Assuming, arguendo, that TTK breached the REFA in this manner, Meridian presented no evidence to show that FHB intentionally induced TTK not to refer its negotiations with FHB, MPFG, and Credit Suisse to Meridian. Although it is unclear from the record the exact date when FHB was informed of Meridian's relationship with TTK, it is clear that FHB was not informed until after the November 1999 MPFG proposal was sent to TTK. From the time FHB was informed of the TTK/Meridian relationship until Fong revealed to Meridian that he was working with FHB and MPFG, there is no evidence that FHB intentionally induced TTK to not refer its negotiations to Meridian.

Furthermore, Fong's deposition indicates that *he* waited until he was assured that FHB/MPFG could negotiate a loan for TTK/KVA before he disclosed to Meridian that he was working with FHB/MPFG. Fong's deposition, attached to Meridian's Opposition Memorandum, stated:

Q.[9] In your own lind [sic], do you have a date, specific date, when you recall first

---

9. It is unclear from the record who was questioning Fong during this portion of the deposition.

informing Mr. Park that you were working on a loan through First Hawaiian Bank or Mr. Pinkston?

A. [Fong] I do not recall exactly what date it was, but—

Q. Do you remember like an event that might cause it to happen?

A. That we are getting, we were getting firm possibility that First Hawaiian Bank, and Pinkston can bring in a commitment letter.

Q. . . .

What was the discussion that you had with Mr. Park when you first told him? We will settle the date later about, but what were you telling him?

A. That we must have the funding or we must have the mortgage obtained because the pressure from Japan is growing and growing that we, we have to, we have to resolve the Long Term Credit Bank problem.

Q. And how did you bring up the subject of First Hawaiian Bank and Mr. Pinkston?

A. Well, First Hawaiian Bank and Pinkston at that time was very sure [sic], and we just let First Hawaiian Bank and Pinkston in particular I work with [sic] because at that time I already engaged the law firm to be handling the negotiation with Pinkston.

The continuation of Fong's deposition was attached to FHB's Reply Memorandum:

Q. But *you waited to tell him this until after it was clear to you from the documents that First Hawaiian Bank and Pinkston were going to be able to get you a loan of some kind?*

A. *That's correct.*

. . . .

Q. Without having them in front of you, can you tell me if the conversation with Mr. Park took place after you got the document showing that Credit Suisse was committed to lending or if it was before that, just after the first document where

only First Hawaiian Bank and Pinkston's company were committed to lending.

A. I think my recollection is that it was, it was shortly before I get [sic] the documentation, but I already gotten [sic] the assurance that the transaction is going to be approved and moved forward.

(Emphasis added.)

Without evidence of an act of intentional inducement, Meridian had no basis for its claim that FHB tortiously interfered with Meridian's contractual relationship with TTK. Evidence merely of a breached contract was insufficient to sustain a tortious interference with contractual relations claim. Therefore, FHB was entitled to judgment as a matter of law, and the circuit court did not err by granting summary judgment in favor of FHB on Meridian's tortious interference with contractual relations claim.[10]

### B. Tortious Interference With Prospective Business Advantage

 Meridian argues that triable issues of fact existed with regard to its tortious interference with prospective business advantage claim.

 The Hawai'i Supreme Court in *Robert's Hawaii* recognized the tort of tortious interference with prospective business advantage. The court laid out the elements of the tort as follows:

(1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the

---

10. Meridian Mortgage, Inc. (Meridian) also contends the circuit court erred by concluding that the only relevant contract was the Settlement Agreement that replaced the "Real Estate Financing Agreement" (REFA). First Hawaiian Bank (FHB) argues that the Settlement Agreement replaced the REFA because the Settlement Agreement was fully and completely integrated

by its own terms. FHB maintains the only actionable contract was the Settlement Agreement and since Meridian based its claims on the REFA, Meridian's case should be dismissed.

Since this court concludes that Meridian's tortious interference with contractual relations claim, which was based on the REFA, failed, it is unnecessary to address this contention.

relationship, advantage, or expectancy; and (5) actual damages.

91 Hawai'i at 258, 982 P.2d at 887 (emphasis and footnote in original omitted).

Meridian's Complaint alleged in relevant part:

23. An economic relationship existed between Plaintiff and TT Keeau [sic], Inc. This relationship had the probability of ripening into future economic benefit. Defendant had knowledge of such relationship between Plaintiff and the potential investors. *By soliciting TT Keeau [sic], Inc. and then procuring a financing commitment through Credit Suisse First Boston Mortgage Capital, Defendant intentionally acted to disrupt such relationship.*

24. The foregoing acts and communications by Defendant constitute the tortious interference with prospective advantage.

(Emphasis added.) In Meridian's response to FHB's First Request for Answers to Interrogatories and for Production of Documents (which response was attached to FHB's Motion to Dismiss/SJ), Meridian stated that the phrase "between Plaintiff and potential investors" in allegation 23 of the Complaint was mistaken and should have read that FHB had knowledge of the economic relationship "between Plaintiff and TT Keeau [sic], Inc."

In its Opposition Memorandum, Meridian argued:

Meridian had a valid business relationship with TTK in which it had not only the contract with TTK, but the expectancy that negotiations authorized under that contract would ripen into a loan commitment and a concomitant fee. FHB knew of this relationship and the existence of the REFA, yet took steps to see that Meridian's expectancy would be substantially degraded.

The Hawai'i Supreme Court in *Robert's Hawaii* did not expand further on the individual elements of the tort, particularly the intent element. However, the court referred to *Locricchio v. Legal Services Corp.*, 833 F.2d 1352 (9th Cir.1987), and *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir.1997), as case law in support of its holding. With respect to intent, the Ninth Circuit Court of Appeals in *Locricchio*

stated that "tortious interference requires a state of mind or motive more culpable than mere intent." 833 F.2d at 1358. In *Omega*, the court further explained:

The third element, intent, denotes purposefully *improper* interference. The plaintiff must prove that the defendant either pursued an improper objective of harming the plaintiff or used wrongful means that caused injury in fact. Asserting one's rights to maximize economic interests does not create an inference of ill will or improper purpose.

127 F.3d at 1166 (internal quotation marks and citations omitted; emphasis in original).

As aforementioned, FHB was not made aware of the Meridian/TTK relationship until after the MPFG proposal was delivered in *late November 1999.* Thus, assuming arguendo that FHB solicited TTK's business during Hosogai's *September/October 1999* visit with Iida, there could be no evidence that FHB solicited TTK's business with "a purposeful intent to interfere with the relationship[.]" *Robert's Hawaii*, 91 Hawai'i at 258, 982 P.2d at 887. Without knowledge of the relationship at the time, FHB could not possess the requisite intent.

This court next looks at Meridian's claim that by procuring a financing commitment through Credit Suisse, FHB had the purposeful intent to interfere with the Meridian/TTK relationship. The record shows that prior to the delivery of the MPFG proposal, Credit Suisse had already indicated to Pinkston that it would fund the TTK/KVA loan subject to the normal reviews. Again, without knowledge of the Meridian/TTK relationship at the time FHB procured the financing commitment, FHB could not possess a purposeful intent to interfere with that relationship. Meridian did not present evidence showing that FHB "pursued an improper objective of harming" Meridian or "used wrongful means that caused injury in fact." *Omega*, 127 F.3d at 1166. Therefore, FHB was entitled to judgment as a matter of law, and the circuit court did not err in granting summary judgment in favor of FHB on Meridian's tortious interference with prospective business advantage claim.

## C. Common Law Unfair Competition

 Meridian contends the circuit court erred by dismissing its common law unfair competition claim. Specifically, Meridian argues the evidence showed "that FHB received work product generated by Meridian and used that to pursue the [Credit Suisse] loan."

Hawai'i case law on common law unfair competition has been limited to passing references. This court stated in *Hawaiian Insurance & Guaranty Co., Ltd. v. Blair, Ltd.*, 6 Haw.App. 447, 455, 726 P.2d 1310, 1315 (1986), that " 'passing off' or 'palming off' an inferior product for a better product . . . may constitute unfair competition." In *Auto Rental Co., Ltd. v. Lee*, 35 Haw. 77 (1939), the Supreme Court of the Territory of Hawai'i in deciding an action in equity under the Fair Trade Act of Hawaii noted:

> Equity will intervene to enjoin the actual or threatened interference with property rights or rights of a pecuniary nature where the tortious acts complained of, though not criminal in their nature, constitute a legal wrong such as unfair competition. . . . The rule that a court of equity concerns itself only in the protection of property rights treats *any civil right of a pecuniary nature as a property right* and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired. It is this right that furnishes the basis of the jurisdiction in the ordinary case of unfair competition.

*Id.* at 93 (citation and ellipsis in original omitted; emphasis in original).

The United States Supreme Court in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), explained:

> *"Unfair competition," as known to the common law, is a limited concept.* Primarily, and strictly, it relates to the palming off of one's goods as those of a rival trader. In recent years, its scope has been extended. It has been held to apply to misappropriation as well as misrepresentation, to the selling of another's goods as one's own—to misappropriation of what equitably belongs to a competitor. Unfair-

ness in competition has been predicated of [sic] acts which lie outside the ordinary course of business and are tainted by fraud or coercion or conduct otherwise prohibited by law.

*Id.* at 531–32, 55 S.Ct. at 844 (citations omitted; emphasis added). Moreover, in *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), the Supreme Court stated:

> With some notable exceptions, including the interpretation of the Illinois law of unfair competition at issue in *Sears*[*, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, [11 L.Ed.2d 661] (1964) ] and *Compco* [*Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, [11 L.Ed.2d 669] (1964) ], . . . *the common-law tort of unfair competition has been limited to protection against copying of nonfunctional aspects of consumer products which have acquired secondary meaning such that they operate as a designation of source.*

489 U.S. at 157–58, 109 S.Ct. at 981 (emphasis added).

 This court agrees with the United States District Court for the Eastern District of New York that to prevail in an action for unfair competition, the plaintiff "must establish (1) the 'palming off' of defendant's product as plaintiff's product, or (2) 'consumer-confusion' between the two products because plaintiff's product had acquired a secondary meaning or because of other reasons, or (3) misappropriation of plaintiff's property or merchandise through misrepresentation or some other form of commercial immorality." *Barton Candy Corp. v. Tell Chocolate Novelties Corp.*, 178 F.Supp. 577, 583 (E.D.N.Y. 1959).

The evidence Meridian references as showing that FHB received Meridian work product merely shows that on or about September 27, 1999 Fong sent to FHB the following documents regarding Kona Village Resort: (1) Annual Profit & Loss Statements–1999 (Projected), 1998, 1997 and 1996 (Actual); (2) 12 months Profit & Loss Statement ending 08/31/99; (3) Projected 5–years Operational Pro-forma Statements–1997 to 2002; (4) Fact Sheets on Kona Village Resort; (5) Kona

**50**

Village Resort Occupancy & ADR 1996 to 1999; and (6) A Limited Summary Market Value Appraisal of the Leasehold Interest (Appraisal) done by Hastings, Conboy, Braig & Associates, Ltd., in September 1999. There is no evidence that any of these documents were Meridian's property or merchandise. A diligent review of the record does not reveal any evidence of any of the three types of unfair competition.

Meridian failed to show that there was a genuine issue of material fact as to its common law unfair competition claim. Therefore, this court concludes the circuit court did not err by granting summary judgment in favor of FHB with respect to the common law unfair competition claim.

### IV.

We affirm the Final Judgment filed on April 30, 2003 in the Circuit Court of the First Circuit.

